[No. S057270. Jan. 29, 1998.]

RICKY LYNN PITTS et al., Plaintiffs and Appellants, v.
COUNTY OF KERN et al., Defendants and Respondents.

COLLEEN DILL FORSYTHE et al., Plaintiffs and Appellants, v.
COUNTY OF KERN et al., Defendants and Respondents.

**COUNSEL**

Stanley M. Becker for Plaintiffs and Appellants.

B. C. Barmann, Sr., County Counsel, Mark L. Nations, Chief Deputy County Counsel, Lynda M. Taylor, Deputy County Counsel, Robinson, Palmer & Stanton, Robinson, Palmer & Logan and William D. Palmer for Defendants and Respondents.

John J. Sansone, County Counsel (San Diego), Diane Bardsley, Chief Deputy County Counsel, Morris G. Hill, Deputy County Counsel, Paul J. Pfingst, District Attorney (San Diego), Edward J. Mantyla, Brian E. Michaels and Thomas F. McArdle, Deputy District Attorneys, and Ruth Sorensen as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**BROWN, J.**—A local government, such as a county, is a "person" within the meaning of 42 United States Code section 1983 (section 1983); hence a

local government may be found liable for damages under this section. In contrast, neither a state nor state officials sued in their official capacity are "person[s]" within the meaning of section 1983 when sued for damages; hence neither may be found liable under the statute. Here we address whether, for purposes of local government damages liability, a California district attorney acts on behalf of the state or the county when preparing to prosecute and while prosecuting criminal violations of state law, and when establishing policy and training employees in these areas. If we conclude the district attorney acts on behalf of the state, our inquiry is over. If, however, we conclude a district attorney acts on behalf of the county, we must also consider whether the absolute immunity afforded the district attorney in this case under section 1983 also immunizes the county.

The Court of Appeal concluded there was a triable issue of fact as to the first issue, and that a county is not immune merely because its district attorney is immune. We conclude that the issue of whether a district attorney is a policymaker for the county is one of law, not fact, and that the district attorney represents the state, not the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas. We therefore reverse the judgment of the Court of Appeal.

## I. FACTS AND PROCEDURAL BACKGROUND

In 1985, Ricky Lynn Pitts, Marcella Pitts, Colleen Dill Forsythe, Grace Dill, Wayne Dill, Jr., Gina Miller, and Wayne Forsythe were convicted of numerous sex offenses committed against several children.[1] Those individuals were either related to the children or acquaintances of the relatives. (*People* v. *Pitts, supra*, 223 Cal.App.3d 606, 634, 636.) In 1990, the convictions were reversed on appeal because of prosecutorial misconduct. (223 Cal.App.3d at pp. 690, 915.) In December 1990, the defendants in the

---

[1] Ricky Lynn Pitts, Marcella Pitts, and Colleen Dill Forsythe were each convicted of one count of violating Penal Code section 182, forty-five counts of violating Penal Code section 288, subdivision (b), two counts of violating Penal Code section 311.4, subdivision (c), three counts of violating Penal Code section 273a, and two counts of violating Penal Code section 245. They were each sentenced to 373 years in prison. Grace Dill, Wayne Dill, Jr., and Gina Miller were each convicted of one count of violating Penal Code section 182, forty-nine counts of violating Penal Code section 288, subdivision (b), two counts of violating Penal Code section 311.4, subdivision (c), three counts of violating Penal Code section 273a, and two counts of violating Penal Code section 245. They each were sentenced to 405 years in prison. Wayne Forsythe was convicted of one count of violating Penal Code section 182, thirty-four counts of violating Penal Code section 288, subdivision (b), six counts of violating Penal Code section 311.4, subdivision (c), and three counts of violating Penal Code section 273a. He was sentenced to 285 years in prison. (*People* v. *Pitts* (1990) 223 Cal.App.3d 606, 634-635 [273 Cal.Rptr. 757].)

criminal action were released from state prison. According to the Court of Appeal, and undisputed by the parties, in 1991 the district attorney dismissed the charges, and by 1994 all of the child witnesses had recanted and claimed their testimony was coerced.

On March 31, 1992, Ricky Lynn Pitts and Marcella Pitts filed a third amended complaint against Kern County (County), Edward Jagels, individually and as District Attorney of Kern County (Jagels), Michael Vendrasco, a deputy district attorney and chief prosecutor in the Pitts criminal case (Vendrasco), Carol Darling, sex abuse program coordinator of the Kern County District Attorney's office (Darling), Andrew Gindes, a deputy district attorney and a prosecutor in the Pitts criminal case, Kern County Department of Human Services, Child Protective Services, Larry Kleier, individually and as Sheriff of Kern County, Deputy Sheriff Jesse Sneed of the Kern County Sheriff's Department, and Kern County Sheriff's Department Sergeants Bob Fields, Brad Darling, and Jack Rutledge, and other defendants, alleging in part civil rights violations based on alleged misconduct during the criminal prosecution. (*People* v. *Pitts*, *supra*, 223 Cal.App.3d at pp. 638, 640, 641.) The Pittses sought compensatory and punitive damages, and attorneys' fees.

On December 3, 1992, Colleen Dill Forsythe, Grace Dill, and Gina Miller filed a fourth amended complaint, which, as relevant here, made similar allegations against the same parties, and sought similar damages. The trial court consolidated the two cases. (Ricky Lynn Pitts, Marcella Pitts, Colleen Dill Forsythe, Grace Dill, and Gina Miller are hereafter referred to as plaintiffs.)

The County, Jagels, individually and as district attorney, Vendrasco, and Darling filed a motion for summary judgment on the ground that plaintiffs' allegations were barred by absolute prosecutorial immunity, and that the County was immune for any acts for which these individual defendants were immune. Summary judgment was entered for Jagels (both as an individual and as district attorney), Vendrasco, and Darling.

The trial court entered summary judgment for the County on two grounds. First, it concluded the County was absolutely immune from liability for any act for which Jagels, Vendrasco, and Darling had immunity. Second, it concluded the County had no ability to hire, fire, or discipline Jagels, who was an elected public official, "or suggest how he should run his department."

Following this ruling, the County successfully moved to sever and for separate trial on the claims against the County based on the conduct of the

remaining defendants. At the remaining defendants' trial, the court granted motions for nonsuit on behalf of Gindes and Kleier, and dismissed the action as to Sneed. The jury returned special verdicts finding that none of the other defendants—Rutledge, Fields, and Brad Darling—had violated any constitutional right of the plaintiffs. The court thereafter granted the County's motion to dismiss, and entered judgment in its favor.

The Court of Appeal affirmed the entry of summary judgment for Jagels, Vendrasco, and Darling. It reversed summary judgment as to the County. In reversing the trial court's first basis for entering summary judgment for the County, the Court of Appeal concluded a county is not automatically immune from liability for any act for which its employees or elected officials have absolute immunity.

In rejecting the second basis, the Court of Appeal stated that a California district attorney has attributes of both a state and local officer. "Lacking some persuasive authority, we cannot hold as a matter of law that Jagels was not a county policymaker for section 1983 purposes." "Here, the plaintiffs presented evidence from which a reasonable trier of fact could find coercive and threatening conduct on the part of members of the district attorney's office. The alleged conduct exceeded the clearly established legal norms for preparing witnesses for trial. [Citation.] County is not entitled to summary judgment unless it established that the conduct did not result from a policy or custom to procure false statements and/or testimony and/or that County did not have a deliberate indifference towards its obligation to supervise or train the employees of the district attorney's office adequately. County did not do so. Instead, it merely denied the plaintiffs' allegations. It produced no evidence establishing that County policies did not promote the unlawful conduct in question, or that the policies of the district attorney's office did not constitute official county policy." The court concluded several triable issues of material fact remained: Was Jagels a policymaker for the County for purposes of section 1983; did any of the alleged prosecutorial conduct result from a county policy or custom; and did plaintiffs suffer any constitutional injury as a result of that conduct.

We granted the County's petition for review.

## II. DISCUSSION

### A. *Background on Section 1983*

Section 1983,[2] a long-dormant Reconstruction-era civil rights statute, gained modern vitality in *Monroe* v. *Pape* (1961) 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492], overruled in part by *Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 663 [98 S.Ct. 2018, 2022, 56 L.Ed.2d 611]. (Schwartz, Litigating Section 1983 Claims: Civil Rights and Official Misconduct Cases in Federal and State Courts (Cont.Ed.Bar 1985) p. 1.) ■ Its primary purposes are compensation and deterrence "for violations of federal rights committed by persons acting under color of state law." (*Howlett* v. *Rose* (1990) 496 U.S. 356, 358 [110 S.Ct. 2430, 2433, 110 L.Ed.2d 332], fn. omitted; *Newport* v. *Fact Concerts, Inc.* (1981) 453 U.S. 247, 267-268 [101 S.Ct. 2748, 2759-2760, 69 L.Ed.2d 616].) Section 1983 claims may be brought in either state or federal court. (*Howlett* v. *Rose*, *supra*, 496 U.S. at p. 358 [110 S.Ct. at p. 2433].)

### 1. *Which entities are "person[s]"* (and hence potentially liable) under section 1983

■ Neither states nor state officials acting in their official capacities are "person[s]" within the meaning of section 1983 when sued for damages. (*Will* v. *Michigan Dept. of State Police* (1989) 491 U.S. 58, 71, fn. 10 [109 S.Ct. 2304, 2312, 105 L.Ed.2d 45]; *Howlett* v. *Rose*, *supra*, 496 U.S. at p. 365 [110 S.Ct. at p. 2437] ["[T]he State and arms of the State . . . are not subject to suit under § 1983 in either federal court or state court."].) Hence, neither can be sued for damages under section 1983, even in state court. (See *Will* v. *Michigan Dept. of State Police*, *supra*, 491 U.S. at pp. 63-64, 71, fn. 10 [109 S.Ct. at pp. 2308-2309, 2312].)

In *Monell* v. *New York City Dept. of Social Services*, *supra*, 436 U.S. 658, the high court overruled that portion of *Monroe* which held that local governments were not "person[s]" within the meaning of section 1983, and hence were wholly immune from suit. (*Id.* at pp. 663, 690 [98 S.Ct. at pp. 2022, 2035-2036].) ■ Under *Monell*, local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes

---

[2]Section 1983 provides, and at all pertinent times in this action provided in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." (*Id.* at pp. 690-691 [98 S.Ct. at pp. 2035-2036].) Local government includes counties as well as cities. (*McMillian* v. *Monroe County* (1997) 520 U.S. 781, __-__ [117 S.Ct. 1734, 1735-1736, 138 L.Ed.2d 1] [if sheriff's actions constitute county as opposed to state policy, then county is liable under section 1983]; *Monell* v. *New York City Dept. of Social Services, supra,* 436 U.S. at p. 690, fn. 54 [98 S.Ct. at p. 2036] [Section 1983 applies to "local government units which are not considered part of the State for Eleventh Amendment purposes."].)

However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." (*Monell* v. *New York City Dept. of Social Services, supra,* 436 U.S. at p. 691 [98 S.Ct. at p. 2036], original italics.) Thus, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." (436 U.S. at p. 694 [98 S.Ct. at pp. 2037-2038]; see *Pembaur* v. *Cincinnati* (1986) 475 U.S. 469, 481 [106 S.Ct. 1292, 1299, 89 L.Ed.2d 452] (plur. opn. of Brennan, J.) ["Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. [Fn. omitted.]"].)

■ Moreover, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (*Bd. of County Com'rs of Bryan County, Okl.* v. *Brown* (1997) 520 U.S. 397, __ [117 S.Ct. 1382, 1388, 137 L.Ed.2d 626], original italics.) "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." (*Id.* at p. __ [117 S.Ct. at p. 1389].)

### 2. *Difference between personal and official capacity suits*

■ "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." (*Kentucky* v. *Graham* (1985) 473 U.S. 159, 165 [105 S.Ct. 3099, 3105, 87 L.Ed.2d 114].) "Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (*Ibid.*; *Will* v. *Michigan Dept. of State Police, supra,* 491 U.S. at p. 71 [109 S.Ct. at p. 2312] [While "state officials literally are persons," "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. [Citation.] As such, it is no different from a suit against the State itself."]; see *Brandon* v. *Holt* (1985) 469 U.S. 464, 471-472 [105 S.Ct. 873, 877-878, 83 L.Ed.2d 878].) "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (*Kentucky* v. *Graham, supra,* 473 U.S. at p. 166 [105 S.Ct. at p. 3105].)

"When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses . . . . See *Imbler* v. *Pachtman,* 424 U.S. 409 [96 S.Ct. 984, 47 L.Ed.2d 128] (1976) (absolute immunity); [citations]. In an official-capacity action, these defenses are unavailable. [Citations.] The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." (*Kentucky* v. *Graham, supra,* 473 U.S. at pp. 166-167 [105 S.Ct. at pp. 3105-3106], fn. omitted.)

### 3. *Prosecutorial immunity*

■ The availability of immunity from liability under section 1983 in state court is governed by federal, not state, law. (*Howlett* v. *Rose, supra,* 496 U.S. at pp. 375, 383 [110 S.Ct. at pp. 2442, 2446-2447].) In *Imbler* v. *Pachtman* (1976) 424 U.S. 409 [96 S.Ct. 984, 47 L.Ed.2d 128], the high court held that state prosecutors are absolutely immune from liability under section 1983 for conduct that is "intimately associated with the judicial phase of the criminal process." (*Id.* at pp. 430-431 [96 S.Ct. at p. 995].) Such conduct includes initiating a prosecution and presenting the state's case (*id.* at p. 431 [96 S.Ct. at p. 995]), and participating in a probable cause hearing (*Burns* v. *Reed* (1991) 500 U.S. 478, 487 [111 S.Ct. 1934, 1939-1940, 114 L.Ed.2d 547]).

*Imbler* accorded prosecutors absolute immunity under these circumstances out of "concern that fear of potential liability would undermine a prosecutor's performance of his duties by forcing him to consider his own potential

liability when making prosecutorial decisions and by diverting his 'energy and attention . . . from the pressing duty of enforcing the criminal law.'" (*Buckley* v. *Fitzsimmons* (1993) 509 U.S. 259, 270, fn. 4 [113 S.Ct. 2606, 2614, 125 L.Ed.2d 209], quoting *Imbler* v. *Pachtman, supra,* 424 U.S. at pp. 424-425 [96 S.Ct. at pp. 992-993].) "Suits against prosecutors would devolve into 'a virtual retrial of the criminal offense [in] a new forum,' [citation], and would undermine the vigorous enforcement of the law by providing a prosecutor an incentive not 'to go forward with a close case where an acquittal likely would trigger a suit against him for damages.'" (*Ibid.*) The court also "expressed concern that the availability of a damages action might cause judges to be reluctant to award relief to convicted defendants in post-trial motions." (*Ibid.*)

Prosecutors are only entitled to qualified immunity, however, for conduct not "intimately associated with the judicial phase of the criminal process," including giving legal advice to police, or conducting investigations regarding an individual before there is probable cause to have that individual arrested. (*Imbler* v. *Pachtman, supra,* 424 U.S. at p. 430 [96 S.Ct. at pp. 994-995]; *Burns* v. *Reed, supra,* 500 U.S. at p. 496 [111 S.Ct. at pp. 1944-1945]; *Buckley* v. *Fitzsimmons, supra,* 509 U.S. at pp. 272-275 [113 S.Ct. at pp. 2615-2617].)

B. *Plaintiffs' Claims*

 At the outset, we delineate the precise claims we are addressing. The County petitioned for review on the issues of whether for purposes of local government damages liability under section 1983, a California district attorney functions as a policymaker for the county in which he or she holds office when preparing to prosecute and while prosecuting criminal violations of state law, and, if so, does the absolute immunity afforded the district attorney in this case under section 1983 also immunize the county.

Plaintiffs have, to a certain extent, conceded the first issue. They state, for example, that "a California district attorney may act for the state in *conducting* a prosecution, but he acts for the County otherwise," and that "[i]t is only when the district attorney, or his assigned deputy, is actually prosecuting a specific criminal action, or is in the process of actually preparing to prosecute a specific criminal action, that he acts on behalf of the people of the State of California." They essentially contend, however, that a district attorney represents the county when training staff or developing policies regarding criminal prosecutions. Not surprisingly, the County contends that when preparing to prosecute and when prosecuting criminal violations of state law, including training and developing policies for a prosecutorial staff, the district attorney does not act as a policymaker for the county.

We agree with plaintiffs that the first issue on which we granted review fairly includes the issue of which entity is represented when the district attorney establishes policy or trains employees to prepare and prosecute cases involving criminal violations of state law. According to the Court of Appeal, "It is undisputed that Jagels did not personally prosecute the Pitts case and he never personally interrogated plaintiffs or any of the child witnesses." Rather, the complaints allege the County and Jagels, in his official capacity, established a pattern, custom, and practice of procuring false statements and testimony by threat, promise, intimidation, force, bribery, and coercion of witnesses, and thereby established an official policy governing the conduct of Jagels's employees. Furthermore, the County and Jagels failed to provide adequate training, procedures, guidelines, rules, and regulations to prevent such conduct by district attorney employees, and hence were deliberately indifferent to plaintiffs' constitutional rights. The official policy and the failure to act were actual causes of the deprivation of plaintiffs' rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. In particular, plaintiffs assert their constitutional right to a fair and impartial trial free of knowingly procured false testimony was violated.

We therefore first address whether a district attorney represents the county or the state when preparing to prosecute and when prosecuting criminal violations of state law, and then consider which entity the district attorney represents when establishing policy and training employees in these areas.

Naturally, the County does not challenge the trial court's and Court of Appeal's ruling that Jagels, Vendrasco, and Darling had absolute prosecutorial immunity. Accordingly, the efficacy of that ruling is not before us. Contrary to plaintiffs' contention, the County's derivative immunity claim does not revive the question of prosecutorial immunity. Prosecutorial immunity is only available to a defendant sued in his or her personal, not official capacity (*ante*, p. 350), and Jagels is not a party here.[3]

*District Attorney as Policymaker; Issue of Fact or Law*

■ Contrary to the conclusion of the Court of Appeal, it is settled that whether an official is a policymaker for a county is dependent on an analysis of state law, not fact. (*McMillian* v. *Monroe County, supra*, 520 U.S. at p. ___ [117 S.Ct. at pp. 1736-1737] [inquiry of which entity an official represents when acting in a particular capacity "dependent on an analysis of state law"];

---

[3]Plaintiffs assert for the first time in their answer brief that we should also consider whether the County, through its board of supervisors, "is nevertheless chargeable with municipal liability under § 1983 if the district attorney does not establish *official* policy within his office." We decline to do so.

*Jett* v. *Dallas Independent School Dist.* (1989) 491 U.S. 701, 737 [109 S.Ct. 2702, 2724, 105 L.Ed.2d 598] ["[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." (Original italics.)].)

Rather, "[r]eviewing the relevant legal materials, including state and local positive law, as well as ' "custom or usage" having the force of law,' [citation], the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." (*Jett* v. *Dallas Independent School Dist., supra,* 491 U.S. at p. 737 [109 S.Ct. at p. 2724].) "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, [citation], or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." (*Ibid.,* original italics.)

"This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1737].) Moreover, we need not answer the question "in some categorical, 'all or nothing' manner." (*Ibid.*) The high court's "cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." (*Ibid.*) "Thus, we are not seeking to make a characterization of [California district attorneys] that will hold true for every type of official action they engage in." (*Ibid.*) We simply consider whether Jagels represents the state or the County when preparing to prosecute and when prosecuting criminal violations of state law, and when training and developing policies for employees engaged in these activities.

### *McMillian v. Monroe County*

Recently, in *McMillian* v. *Monroe County, supra,* 520 U.S. 781, the United States Supreme Court provided an analytical framework for resolving the question of which entity a government official represents when performing a certain function. In particular, the court considered whether Alabama

sheriffs represent the county or the state for purposes of section 1983 when they act in a law enforcement capacity. (*Id.* at pp. __-__ [117 S.Ct. at pp. 1736-1737].) In *McMillian*, the plaintiff spent six years in prison before his capital murder conviction was reversed on the ground that the state had suppressed exculpatory evidence. (*Id.* at p. __ [117 S.Ct. at p. 1736].) Following his release, he sued various parties, including the Monroe County Sheriff in his official capacity, on the ground that he had intimidated a witness into making false statements and suppressed exculpatory evidence. (*Ibid.*) The high court concluded, "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." (*Id.* at p. __ [117 S.Ct. at p. 1740].)

In so doing, the high court considered a variety of factors. (*McMillian* v. *Monroe County, supra*, 520 U.S. at pp. __-__ [117 S.Ct. at pp. 1737-1740].) First, it looked to the Alabama Constitution. (*Id.* at p. __ [117 S.Ct. at p. 1737].) It concluded that "the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court strongly support Monroe County's contention that sheriffs represent the State, at least for some purposes." (*Id.* at pp. __-__ [117 S.Ct. at pp. 1737-1738].) In particular, since 1901, but not previously, the Alabama Constitution has provided that sheriffs are members of the state executive department. (*Id.* at p. __ [117 S.Ct. at p. 1738].) Such members have to take an oath of office, and "are required to submit written reports to the governor on demand." (*Id.* at p. __, fn. 4 [117 S.Ct. at p. 1738].) Moreover, sheriffs are subject to the "same impeachment procedures as state legal officers and lower state court judges . . . ." (*Id.* at p. __ [117 S.Ct. at p. 1738].) Finally, "[c]ritically for [the high court], the Alabama Supreme Court has interpreted these provisions and their historical back- ground as evidence of 'the framers' intent to ensure that sheriffs be consid- ered executive officers of the state.' [Citation.] Based primarily on this understanding of the State Constitution, the court has held unequivocally that sheriffs are state officers, and that tort claims brought against sheriffs based on their official[] acts therefore constitute suits against the State, not suits against the sheriff's county." (*Id.* at pp. __-__ [117 S.Ct. at pp. 1738-1739].)

Next, the high court examined the relevant provisions of the Alabama Code. (*McMillian* v. *Monroe County, supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1739].) It found these provisions "are less compelling, but still support the conclusion [that sheriffs represent the state] to some extent." (*Ibid.*) First, judges, who are state officers, "may order the sheriff to take certain actions, even if the judge sits in a distant county." (*Ibid.*) Second, "the sheriff must give to the county treasurer a sworn written statement detailing the funds he

has received for the county since his last statement, and must pay these funds to the treasurer. [Citation.] In contrast to the state judges, however, the county treasurer does not appear to have any statutory authority to direct the sheriff to take specific actions." (*Ibid.*)

"Third and most importantly, . . . sheriffs are given complete authority to enforce the state criminal law in their counties. In contrast, the 'powers and duties' of the counties themselves . . . do not include any provision in the area of law enforcement. [Citation.] Thus, the 'governing body' of the counties . . . cannot instruct the sheriff how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime. And when the sheriff does secure such evidence, he has an obligation to share this information not with the county commission, but with the district attorney (a state official, see *Hooks* v. *Hitt*, 539 So.2d 157, 159 (Ala. 1988))." (*McMillian* v. *Monroe County, supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1739].) "While the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the governor and the attorney general do have this kind of control." (*Ibid.*) These individuals "can direct the sheriff to investigate 'any alleged violation of law in their counties,' " and submit a written report to the state official in charge of the investigation. (*Ibid.*) Finally, the high court noted that "the salaries of all sheriffs are set by the state legislature, not by the county commissions." (*Ibid.*)

The high court found "four important provisions that cut in favor of the conclusion that sheriffs are county officials"—the sheriff's salary was paid by the county, the county provided the sheriff with certain equipment, supplies, lodging, and reimbursement for expenses, the sheriff's jurisdiction was limited to the county borders, and the sheriff was elected locally by the county voters—insufficient "to tip the balance in favor of" the plaintiff. (*McMillian* v. *Monroe County, supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1740].) The county's payment of the sheriff's salary did "not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely." (*Ibid.*) While the county commissions did have discretion to deny operational funds "beyond what is 'reasonably necessary,' " (*ibid.*) "at most, this discretion would allow the commission to exert an attenuated and indirect influence over the sheriff's operations." (*Ibid.*)

In response to the last two factors, the court stated, plaintiff's "contention that sheriffs are county officials because 'state policymakers' typically make policy for the entire State (without limits on their jurisdiction) and are typically elected on a statewide (not local) basis, surely has some force. But district attorneys and state judges are often considered . . . state officials,

even though they too have limited jurisdictions and are elected locally. These characteristics are therefore consistent with an understanding of the 67 Alabama sheriffs as state officials who have been locally placed throughout the State, with an element of control granted to the officials and residents of the county which receives the sheriff's services." (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1740], fn. omitted.) Finally, in response to the plaintiff's concern "that state and local governments will manipulate the titles of local officials in a blatant effort to shield the local governments from liability," the court observed, "there is certainly no evidence of such manipulation here; indeed, the Alabama provisions that cut most strongly against [plaintiff's] position predate our decision in *Monell* by some time." (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1742].)

Significantly, the high court did not state that the factors it considered were exclusive, or that they must always be applicable in order for a court to conclude that a particular official represents the state and not the county. Rather, it considered whether "although there is some evidence in Alabama law that supports [plaintiff's] argument" that sheriffs represent their counties, "the weight of the evidence is strongly on the side of the conclusion" that the sheriffs represent the state. (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1740].) The essential thrust of *McMillian* is that a court must discern which entity a government official represents "in a particular area, or on a particular issue" by examining how the official's functions are defined by state law. (*Id.* at p. __ [117 S.Ct. at p. 1737].) While this law may give varying responses, we look to "the weight of the evidence" to reach a conclusion. (*Id.* at p. __ [117 S.Ct. at p. 1740].)

### 1. *Preparing to Prosecute and Prosecuting Criminal Violations*

We now examine California law to determine whether for purposes of local government damages liability under section 1983, a district attorney represents the state or the county when preparing to prosecute and when prosecuting criminal violations of state law. While the question of who is a local policymaker is decided by the trial judge, not a jury, it conceivably could in some cases involve the introduction of evidence. Here, however, as in *McMillian*, evidence other than the relevant constitutional and statutory provisions is not pertinent.

First, as the high court did in *McMillian*, we consider which entity supervises the work of the district attorney. (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739].) In California, each county district attorney is supervised by the Attorney General. Since 1966, article V,

section 13 of the California Constitution[4] has provided in substance: "Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State. It shall be the duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced. The Attorney General shall have direct supervision over every district attorney . . . in all matters pertaining to the duties of their . . . office[], and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, the Attorney General shall assist any district attorney in the discharge of the duties of that office." (See *People* v. *Honig* (1996) 48 Cal.App.4th 289, 354-355 [55 Cal.Rptr.2d 555] [Article V, section 13 of the California Constitution "confers broad discretion upon the Attorney General to determine when to step in and prosecute a criminal case."].) Since 1945, the Government Code has contained a similar provision.[5]

---

[4]California Constitution, article V, section 13, was preceded by article V, section 21, adopted as an initiative measure by the voters on November 6, 1934. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Prop. 4, Gen. Elec. (Nov. 6, 1934) pt. II, pp. 7-8; Historical Note, 2 West's Ann. Constitution (1996 ed.) foll. art. V, former § 21, p. 27.) The relevant language of former section 21 of article V closely paralleled that of the current Constitution. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Prop. 4, Gen. Elec. (Nov. 6, 1934) pt. II, pp. 7-8.) The purpose of the 1934 initiative was to ease the difficulty of solving crimes, and arresting responsible criminals, by coordinating county law enforcement agencies and providing the necessary supervision by the Attorney General over them. "To convict criminals we must first catch them. The vast majority of felonies committed in this country go down into history as unsolved crimes. Even when we know who the criminals are it is not only difficult but often impossible to arrest them, and the manner in which the Dillingers, the 'Baby Face' Nelsons, the Machine Gun Kellys, the Tuohys and numerous other criminal gangs have been playing hide and seek with the public authorities has truly become a National disgrace." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, argument in favor of Prop. 4 by Earl Warren, Alameda County District Attorney, Gen. Elec. (Nov. 6, 1934) pt. I, p. 9.)

[5]Government Code section 12550 provides: "The Attorney General has direct supervision over the district attorneys of the several counties of the State and may require of them written reports as to the condition of public business entrusted to their charge. [¶] When he deems it advisable or necessary in the public interest, or when directed to do so by the Governor, he shall assist any district attorney in the discharge of his duties, and may, where he deems it necessary, take full charge of any investigation or prosecution of violations of law of which the superior court has jurisdiction. In this respect he has all the powers of a district attorney, including the power to issue or cause to be issued subpenas or other process."

Government Code section 12550 was preceded by virtually identical former Political Code section 477, which was added in 1935. (Stats. 1935, ch. 575, § 2, p. 1669; Historical Note,

In addition, Penal Code section 923, enacted in 1959, provides: "Whenever the Attorney General considers the public interest requires, he may, with or without the concurrence of the district attorney, direct the grand jury to convene for the investigation and consideration of such matters of a criminal nature as he desires to submit to it. He may take full charge of the presentation of such matters to the grand jury, issue subpoenas, prepare indictments, and do all other things incident thereto to the same extent as the district attorney may do." Finally, since 1957, Government Code section 12524 has authorized the Attorney General to "conference" with the district attorneys to discuss their duties "with the view of uniform and adequate enforcement" of state law.[6]

In contrast, the county board of supervisors is statutorily barred from obstructing the district attorney's investigative or prosecutorial function. While Government Code section 25303 generally provides that the "board of supervisors shall supervise the official conduct of all county officers . . . ," it further states that "[t]his section shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the . . . district attorney of a county. The board of supervisors shall not obstruct the . . . investigative and prosecutorial function of the district attorney of a county." (See *Graham* v. *Municipal Court* (1981) 123 Cal.App.3d 1018, 1022 [177 Cal.Rptr. 172] ["A county district attorney prosecuting a criminal action within a county, acts as a *state* officer, exercising ultimately powers which may not be abridged by a county board of supervisors." (Original italics.)]; *Hicks* v. *Board of Supervisors* (1977) 69 Cal.App.3d 228, 240 [138 Cal.Rptr. 101] ["Except for the power of the electorate to remove him," district attorney's performance of prosecutions "subject only to the supervision of the Attorney General."]; see also *Dibb* v. *County of San Diego* (1994) 8 Cal.4th 1200, 1209, fn. 4 [36 Cal.Rptr.2d 55, 884 P.2d 1003] ["[B]oard of supervisors 'does not have the power to perform the county officers' statutory duties for them or direct the manner in which the duties are performed.' [Citation.]"].)

Thus, as with the sheriffs in *McMillian*, California district attorneys "are given complete authority to enforce the state criminal law in their counties.

---

32D West's Ann. Gov. Code (1992 ed.) foll. § 12550, p. 89; Disposition Table, 32 West's Ann. Gov. Code (1995 ed.) p. XCVI, col. 1.)

[6]Indeed, at the request of the Kern County Grand Jury, the Attorney General conducted an extensive investigation of the practices and procedures of the Kern County District Attorney's office, as well as the Sheriff's Department and Child Protective Services, in an unrelated child sexual abuse case. He subsequently published an 80-page public report. (Off. of Atty. Gen., Rep. on the Kern County Child Abuse Investigation (Sept. 1986) pp. i-ii.) As the County notes, "The fact that the Attorney General even investigated the Kern County District Attorney's role in subsequent child molestation investigations . . . is persuasive evidence of the Attorney General's supervisory authority over county district attorneys." We take judicial notice of the report for this purpose. (Evid. Code, § 452, subd. (c).)

In contrast, the 'powers and duties' of the counties themselves . . . do not include any provision in the area of law enforcement. . . . Thus, the 'governing body' of the counties . . . cannot instruct the" district attorney how to investigate or prosecute crime. (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739]; Gov. Code, § 25303.) Moreover, "[w]hile the [board of supervisors] thus has no direct control over how the [district attorney] fulfills his law enforcement duty, the . . . attorney general do[es] have this kind of control." (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739].) The Attorney General can direct the district attorney "to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions," and, more importantly, initiate grand jury investigations and criminal prosecutions in the district attorney's county. (Cal. Const., art. V, § 13; Gov. Code, § 12550; Pen. Code, § 923; see *McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739] [Attorney General "can direct the sheriff to investigate 'any alleged violation of law in their counties,' " and submit a written report "to the state official in charge of the investigation."].)

Moreover, a superior court judge may require a district attorney of an *adjoining* county to conduct certain proceedings. (Gov. Code, § 3073; *McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739] [Judges, who are state officers, "may order the sheriff to take certain actions, even if the judge sits in a distant county."].)

In addition, when prosecuting criminal violations of state law, a district attorney acts in the name of the people of the state. In criminal prosecutions, "[t]he style of all process shall be 'The People of the State of California,' and all prosecutions shall be conducted in their name and by their authority." (Gov. Code, § 100, subd. (b); *id.,* § 26500 ["The district attorney is the public prosecutor . . . . [¶] . . . and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses."]; Pen. Code, § 684 ["A criminal action is prosecuted in the name of the people of the State of California, as a party, against the person charged with the offense."].)

Indeed, over 100 years ago, we recognized, "The district attorney in the discharge of the duties of his office performs two quite distinct functions. He is at once the law officer of the county and the public prosecutor. While in the former capacity he represents the county and is largely subordinate to, and under the control of, the board of supervisors, he is not so in the latter. In the prosecution of criminal cases he acts by the authority and in the name of the people of the state." (*County of Modoc* v. *Spencer* (1894) 103 Cal. 498, 501 [37 P. 483].) This principle has been often repeated since *Modoc.*

(*Nguyen* v. *Superior Court* (1996) 49 Cal.App.4th 1781, 1787 [57 Cal.Rptr.2d 611] ["District attorneys may act as either county or state officers" and "[they] act on behalf of the state when prosecuting crimes."]; *People* v. *Kilborn* (1996) 41 Cal.App.4th 1325, 1333 [49 Cal.Rptr.2d 152] ["The district attorney acts as a state officer when prosecuting crimes."]; *Sloane* v. *Hammond* (1927) 81 Cal.App. 590, 599 [254 P. 648] ["It may be conceded that for some purposes a district attorney is a county officer . . . . When, however, he conducts prosecutions for the punishment of crimes denounced by act of the legislature, he certainly discharges functions which pertain to the state and not to the county, whether or not, technically, he is to be deemed a state officer when he is engaged in the discharge of such functions. Under such circumstances he surely acts as an agent of the state."]; see also *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 122 [130 Cal.Rptr. 257, 550 P.2d 161] [The district attorney "is a public officer, under the direct supervision of the Attorney General [citation], who 'represents the sovereign power of the people of the state, by whose authority and in whose name all prosecutions must be conducted.' "]; *People* v. *Mendez* (1991) 234 Cal.App.3d 1773, 1783 [286 Cal.Rptr. 216] ["The People are ordinarily bound by their stipulations, concessions or representations regardless of whether counsel was the Attorney General or the district attorney."]; *Bach* v. *County of Butte* (1983) 147 Cal.App.3d 554, 570 [195 Cal.Rptr. 268] [acts of *deputy* district attorney do not represent official policy or custom sufficient to make county liable under section 1983]; but see *Heffington* v. *County of Stanislaus* (1983) 143 Cal.App.3d 838, 843-844 [192 Cal.Rptr. 202] [district attorney is a county policymaker under section 1983].)

Thus, these provisions weigh in favor of concluding a district attorney is a state official when preparing to prosecute and when prosecuting criminal violations of state law. Indeed, it is difficult to imagine how a district attorney's enforcement of state law could be characterized as creating local policy. (See *Pusey* v. *City of Youngstown* (6th Cir. 1993) 11 F.3d 652, 657 ["Clearly, state criminal laws . . . represent the policy of the state."].) Moreover, as in *McMillian*, the provisions that most significantly support the conclusion that the district attorney represents the state and not the county when preparing to prosecute and when prosecuting criminal violations of state law predate *Monell* by some time. (*McMillian* v. *Monroe County, supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1742].)[7]

As in *McMillian*, however, there are provisions that weigh in favor of the opposite result. In California, a district attorney is elected by the county

---

[7]In *McMillian*, the high court relied in part on the Alabama Supreme Court's conclusion that tort claims against sheriffs based on their official acts constituted suits against the state, not the county. (*McMillian* v. *Monroe County, supra*, 520 U.S. at pp. __-__ [117 S.Ct. at pp. 1738-1739].) That factor is of little assistance here. In California, it does not appear to be significant which entity the district attorney represents for purposes of tort claims under the circumstances alleged here. Rather, a "public entity," which includes the state and any county

voters (Cal. Const., art. XI, § 1, subd. (b), 4, subd. (c)), is included in the list of "officers of a county" (Gov. Code, § 24000, subd. (a)), and is generally not eligible to hold office unless during certain relevant periods he or she is a registered voter of the county in which the duties of the office are to be exercised (Gov. Code, § 24001). However, the fact that the district attorney's authority is territorially limited is by no means dispositive. "[D]istrict attorneys . . . are often considered . . . state officials, even though they . . . have limited jurisdictions and are elected locally. These characteristics are therefore consistent with an understanding of [district attorneys] as state officials who have been locally placed throughout the State, with an element of control granted to the officials and residents of the county which receives the [district attorney's] services." (*McMillian* v. *Monroe County*, *supra*, 520 U.S. at p. __, fn. omitted [117 S.Ct. at p. 1740].)

In addition, in California, the county's board of supervisors, not the Legislature, "prescribe[s] the compensation" of its district attorney. (Gov. Code, § 25300; compare *McMillian* v. *Monroe County*, *supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1739] [sheriff's salary set by state legislature, not local governing body].) Moreover, under Government Code section 25303, the board of supervisors "shall supervise" the district attorney's official conduct and in particular his or her use of public funds. However, as we have already observed, section 25303 further provides that "[t]his section shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the . . . district attorney of a county. The board of supervisors shall not obstruct the . . . investigative and prosecutorial function of the district attorney of a county." Thus, as in *McMillian*, the county's payment of the district attorney's· salary "does not translate into control over him . . . ." (*McMillian* v. *Monroe County*, *supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1740].) In addition, under Government Code section 29601, subdivision (b)(2), necessary expenses incurred by the district attorney in the prosecution of criminal cases are "county charges." Even assuming this section grants a local governing board discretion to decline to pay what it perceives as unnecessary expenses, "at most, this discretion would allow the [local governing body] to exert an attenuated and indirect influence over the [district attorney's] operations." (*McMillian* v. *Monroe County*, *supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1740].)

---

(Gov. Code, § 811.2), is generally "not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Gov. Code, § 815.2, subd. (b).) An " '[e]mployee' includes an officer . . . ." (Gov. Code, § 810.2.) "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code, § 821.6.) Indeed, two of the plaintiffs conceded in their complaint that "defendant, County, and its employees are relieved from liability for malicious prosecution by reason of Government Code Section 821.6."

In sum, we conclude that when preparing to prosecute and when prosecuting criminal violations of state law, a district attorney represents the state and is not a policymaker for the county. While this issue depends on an analysis of state law, and hence the conclusions of other jurisdictions are not conclusive, we note other jurisdictions have reached the same result. (*Pusey* v. *City of Youngstown, supra,* 11 F.3d at pp. 654, 657-658 [in Ohio, a city prosecutor "acts as a state agent when prosecuting state criminal charges"]; *Arnold* v. *McClain* (10th Cir. 1991) 926 F.2d 963, 964-966 [in Oklahoma, district attorney is a state official when offering police officer choice of resigning or facing perjury charges]; *Owens* v. *Fulton County* (11th Cir. 1989) 877 F.2d 947, 950-952 [in Georgia, prosecutorial decisions of district attorney are on behalf of state; district attorney is not a county policymaker]; see *Chrissy F. by Medley* v. *Mississippi DPW* (5th Cir. 1991) 925 F.2d 844, 846-847, 849 [in Mississippi, district attorney is a state official when allegedly violating court orders and failing to report, investigate, and effectively prosecute sexual abuse allegations; hence damages claim barred by Eleventh Amendment]; *Rozek* v. *Topolnicki* (10th Cir. 1989) 865 F.2d 1154, 1155, 1158 [in Colorado, district attorney's office entitled to Eleventh Amendment immunity].)[8]

### 2. *Training and Supervising Staff*

As noted, plaintiffs contend that even if Jagels is not a policymaker for the County when preparing to prosecute and when prosecuting criminal violations of state law, he does represent the County when he establishes policy or trains employees in these areas.

Just as we have concluded that in California a district attorney represents the state when preparing to prosecute and when prosecuting criminal violations of state law, we further conclude it logically follows that he or she also represents the state, and not the county, when training and developing policy in these areas. No meaningful analytical distinction can be made between these two functions. Indeed, a contrary rule would require impossibly precise distinctions. The district attorney would represent the state when he or she personally prepared to prosecute and prosecuted criminal violations of state law, but the county when training others to do so, or when developing related policies. Moreover, anytime the district attorney relied on a formal policy to handle a particular aspect of a case, that decision would be attributable to the county, even though the prosecution itself would be a state function. Such a result would be nonsensical, and would impose local government liability under the most arbitrary of circumstances.

---

[8]*Heffington* v. *County of Stanislaus, supra,* 143 Cal.App.3d 838, is disapproved to the extent it is inconsistent with this opinion.

Moreover, the constitutional and statutory supervisory power accorded the Attorney General is not reasonably susceptible to an interpretation that it is limited to oversight of a district attorney's actions when he or she is prosecuting a particular case. Rather, the Constitution provides that it is the "duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced," and that the Attorney General has "direct supervision over every district attorney . . . *in all matters pertaining to the duties of their . . . office*[], and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable." (Cal. Const., art. V, § 13, italics added; Gov. Code, § 12550.) This is most reasonably interpreted to include oversight of policies formulated and training conducted in connection with the district attorney's preparation for and prosecution of state criminal violations.

Our conclusion as to which entity the district attorney represents might differ were plaintiffs challenging a district attorney's alleged action or inaction related to hiring or firing an employee, workplace safety conditions, procuring office equipment, or some other administrative function arguably unrelated to the prosecution of state criminal law violations. Those considerations are not presented here.

Plaintiffs assert no compelling basis on which to conclude a district attorney represents the county and not the state when training and developing policy regarding criminal prosecutions. Rather, they assert that "[c]onducting a prosecution does not necessarily contemplate training of personnel or establishing policy or practice," and that the "statutorily designated prosecutorial functions of the district attorney under state law do not include any management, administrative or training function." It is difficult to imagine, however, how criminal prosecutions could be conducted with any efficiency absent these functions. Moreover, we have already concluded that the broad provisions of the Constitution and the Government Code give the Attorney General oversight not only with respect to a district attorney's actions in a particular case, but also in the training and development of policy intended for use in every criminal case.

Plaintiffs also assert that no "state law prescribe[s] the policies of the district attorney's office, nor the manner of training his subordinates, or whether there should be any training at all. The functions are not intimately associated with the judicial process. They are County functions." However, the question of whether a function is intimately associated with the judicial process is relevant only in the context of whether a prosecutor enjoys absolute or qualified immunity for that particular function. (See *ante*, pp.

350-351.) Thus, plaintiffs' argument assumes that the functions for which a prosecutor may obtain absolute, as opposed to qualified, immunity parallel those for which a district attorney represents the state, as opposed to the county. As a comparison of the factors delineated in *Imbler* v. *Pachtman, supra,* 424 U.S. 409, and *McMillian* v. *Monroe County, supra,* 520 U.S. 781, indicate, these are in fact separate inquiries. Indeed, which entity a public official represents in performing a particular function involves an interpretation of state law, and the answer may, as the high court acknowledged, vary from state to state. (*McMillian* v. *Monroe County, supra,* 520 U.S. at p. __ [117 S.Ct. at pp. 1741-1742].) The availability of immunity from liability under section 1983 is, however, governed by federal, not state, law and may not vary from state to state. (*Howlett* v. *Rose, supra,* 496 U.S. at pp. 375, 383 [110 S.Ct. at pp. 2442, 2446-2447].)

Plaintiffs' reliance on our definition of a "public officer" in *Dibb* v. *County of San Diego, supra,* 8 Cal.4th 1200, is also misplaced. *Dibb* involved a taxpayer's suit challenging San Diego County's formation of a citizen's law enforcement review board under the county charter. (*Id.* at pp. 1204-1205.) The plaintiff contended that members of the board were not county officers within the meaning of the state Constitution. (*Id.* at p. 1211.) We concluded they were. (*Id.* at p. 1213.) Here, however, the County has never contended the district attorney is not a public or county officer for some purposes.

Plaintiffs rely, with virtually no discussion, on three opinions from other jurisdictions which they assert have concluded a district attorney represents the local government and not the state when training or developing policy in the area of criminal prosecution. (*Walker* v. *City of New York* (2d Cir. 1992) 974 F.2d 293; *Gobel* v. *Maricopa County* (9th Cir. 1989) 867 F.2d 1201; *Crane* v. *State of Tex.* (5th Cir. 1985) 759 F.2d 412.) As we have already observed, given that the issue of who is a policymaker for a county is a question of state law, it is questionable how persuasive contrary conclusions from different jurisdictions should be. Moreover, all of these cases predate *McMillian,* and their analyses are in any event unconvincing.

In *Walker* v. *City of New York, supra,* 974 F.2d 293, the United States Court of Appeals for the Second Circuit held that when "a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." (*Id.* at p. 301.) The court distinguished an earlier decision, *Baez* v. *Hennessy* (2d Cir. 1988) 853 F.2d 73, which concluded a district attorney represents the state, on the ground that *Baez* had "involved a challenge to the decision by an [assistant district attorney] to prosecute an individual and the district attorney's endorsement of that decision. Here, by

contrast, [the plaintiff] is challenging the district attorney's management of the office—in particular the decision not to supervise or train [assistant district attorneys] on *Brady* and perjury issues." (*Walker* v. *City of New York, supra,* 974 F.2d at p. 301.)

Likewise, in *Ying Jing Gan* v. *City of New York* (2d Cir. 1993) 996 F.2d 522, the United States Court of Appeals for the Second Circuit stated that if the plaintiff's complaint simply attacked the district attorney's decision not to prosecute a particular suspect (whose gang allegedly later killed the person who identified him), the district attorney represented the state. (*Id.* at pp. 525, 535-536.) If, however, the plaintiff alleged that "the District Attorney for New York County had promulgated a policy or custom regarding . . . face-to-face identifications and the alleged failure to protect" crime victims, the district attorney "may be deemed to be a municipal policymaker for New York City." (*Id.* at p. 536.)

We have already explored the difficulties of adopting a distinction regarding which entity the district attorney represents that turns on whether the district attorney performs the act in only one case, or has a policy of performing the act in every case. For these reasons, we find the Second Circuit's analysis unpersuasive.

In *Gobel* v. *Maricopa County, supra,* 867 F.2d 1201, the United States Court of Appeals for the Ninth Circuit did not conclude, as plaintiffs implicitly contend, that an Arizona district attorney is a policymaker for the county. Rather, it stated that in *St. Louis* v. *Praprotnik* (1988) 485 U.S. 112 [108 S.Ct. 915, 99 L.Ed.2d 107], the high court was divided on whether the identification of policymakers is purely a question of state law or a question of fact. (*Gobel* v. *Maricopa County, supra,* 867 F.2d at p. 1207, fn. 12.) Accordingly, it left "to the district court to determine on remand how and whether the plaintiffs can prove that the county attorneys acted as policymakers for Maricopa County in the circumstances of this case." (*Ibid.*) As discussed above (*ante,* pp. 352-353), the high court has since clarified that the issue of who is a county policymaker is one dependent on an analysis of state law.

Finally, in *Crane* v. *State of Tex., supra,* 759 F.2d 412, the United States Court of Appeals for the Fifth Circuit rejected the lower court's conclusion that the district attorney's "accused practices 'were neither done for the county nor subject to its control.' " (*Id.* at p. 428.) It noted that in revising the challenged procedures, "there is no hint of any perceived necessity by the District Attorney to consult with or invite the participation of any state official, for example, a member of the State Attorney General's Office. To

the contrary, the record plainly shows that the District Attorney was alone responsible for the County system and could change it at will." (*Id.* at p. 429.) Because the ultimate authority for determining the relevant procedures reposed in the district attorney, "his decisions in that regard must be considered official policy attributable to the County." (*Id.* at p. 430; cf. *Mairena* v. *Foti* (5th Cir. 1987) 816 F.2d 1061, 1064, fn. 1 [relying on *Crane* to conclude that in Louisiana a district attorney is a local not a state official, and hence suit was not barred by Eleventh Amendment].) In contrast, district attorneys in California are supervised by the Attorney General, and this supervision most reasonably is construed to include the oversight of crime prosecution training and policy.

In sum, we conclude a district attorney acts on behalf of the state when training personnel for and when developing policy regarding the preparation for prosecution and prosecution of criminal violations of state law. Accordingly, we need not reach the second issue in this case, i.e., whether the absolute immunity afforded the district attorney in this case under section 1983 derivatively immunizes the county in which the district attorney holds office.

CONCLUSION

The judgment of the Court of Appeal is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I dissent. The majority are correct that *McMillian* v. *Monroe County* (1997) 520 U.S. 781 [117 S.Ct. 1734, 138 L.Ed.2d 1] (*McMillian*) is the case critical for deciding the present issue. But the application of the *McMillian* test leads me to the conclusion, contrary to the majority, that district attorneys in California are county rather than state officials for most purposes. Although it is true that a district attorney represents the state when prosecuting a criminal case, I agree with the Second Circuit of the United States Court of Appeals and with other courts that when the district attorney engages in training, supervision, and other managerial tasks, he or she is acting as a local policymaker, and the county which he or she represents may be held liable under 42 United States Code section 1983 (section 1983) for systematic civil rights violations, just as a city may be held liable for the violations committed by its police force.

Plaintiffs were convicted in 1985 of multiple counts of sexual abuse of young children and were each sentenced to hundreds of years in prison. In

1990, after they had served several years in state prison, their convictions were overturned on appeal because of numerous instances of prosecutorial misconduct and errors on the part of the trial judge. (*People* v. *Pitts* (1990) 223 Cal.App.3d 606 [273 Cal.Rptr. 757].) In 1991, the district attorney dismissed the case against plaintiffs. By 1994, all of the original child witnesses who had testified recanted and claimed to have been forced to falsely testify. After the dismissal, plaintiffs filed suit against the County of Kern, the sheriff, the district attorney and several members of the district attorney's office. The focus of the complaint was on the alleged misconduct of some of the deputy district attorneys and an investigator with the district attorney's office in coercing false testimony from children, as well as suppressing and failing to reveal exculpatory evidence. The district attorney, who had no direct role in prosecuting the case, was alleged to have fostered a custom or policy condoning this misconduct.

The starting points of any analysis of the county's liability, which is in essence an inquiry into whether the district attorney is considered a county or a state official, are the two guiding principles invoked by the *McMillian* court. First, the question we must resolve is not whether the district attorney acted for the county "in some categorical, 'all or nothing' manner. Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." (*McMillian, supra,* 520 U.S. at p. ___ [117 S.Ct. at p. 1737].) "Second, our inquiry is dependent on an analysis of state law. [Citations.] . . . [O]ur understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." (*Ibid.*)

In determining that a sheriff was, under Alabama state law, a state rather than a county official for law enforcement purposes, the closely divided *McMillian* court engaged in a weighing of a number of factors, not relying on any single one. (*McMillian, supra,* 520 U.S. at p. ___ [117 S.Ct. at pp. 1738-1740].) The opinion did, however, indicate which factors it considered to be the most weighty, finding the provisions of the Alabama Constitution to be the more significant, while those of the Alabama Code "less compelling." (*Id.* at p. ___ [117 S.Ct. at p. 1739].) What the court apparently considered most crucial was the state's singular constitutional structure and history. As the opinion discusses, a 1901 state constitutional amendment changed the status of sheriffs, transforming them from local officials into members of the "executive department" of the state government. The greater role that the Alabama Constitution accorded to the state in supervising sheriffs was occasioned by the latter's historical failure to prevent lynchings. Collusion with lynching was made an impeachable offense and authority to

impeach the sheriff was moved from the county courts to the state supreme court. The *McMillian* court put great importance on the Alabama Supreme Court's interpretation of these state constitutional provisions as "evidence of 'the framers' intent to ensure that sheriffs be considered executive officers of the state.' " (*Id.* at p. __ [117 S.Ct. at p. 1738].)

California, by contrast, has no similar constitutional history or provisions. District attorneys were never made a part of an executive department. There was never a historical need to circumscribe the autonomy of the district attorneys' office for rogue behavior. In fact, in contrast to the scheme in Alabama, district attorneys in California are designated constitutionally and by statute as county officers (Cal. Const., art. XI, § 1, subd. (b); Gov. Code, § 24000). Article XI, section 1, subdivision (b) concerns the constitution of county government and states that "The Legislature shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county." Government Code section 24000 states in pertinent part that "The officers of a county are: [¶] (a) A district attorney." The district attorney is not a member of a state department and the office is not found among the list of state officers set forth in article V, section 14, subdivision (f) of the Constitution. These constitutional and statutory provisions, while perhaps not dispositive of the issue, weigh heavily in favor of finding district attorneys to be county officers, and distinguishes this case from *McMillian*.

It is true, as the majority point out, that article V, section 13 of the California Constitution provides that "[t]he Attorney General shall have direct supervision over every district attorney and sheriff and over *such other law-enforcement officers as may be designated by law*, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may deem advisable." (Italics added.) But the fact that the Attorney General has authority over *all* law enforcement officers, in a general constitutional sense, does not negate the de facto and de jure autonomy of the district attorney's office.

What the court stated in *People* v. *Brophy* (1942) 49 Cal.App.2d 15 [120 P.2d 946], commenting on the same constitutional language as quoted in the above paragraph, is still good law: "Manifestly, 'direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law' does not contemplate absolute control and direction of such officials. Especially is this true as to sheriffs and district attorneys, as the provision plainly indicates. These officials are

public officers, as distinguished from mere employees, with public duties delegated and entrusted to them, as agents, the performance of which is an exercise of a part of the governmental functions of the *particular political unit for which they, as agents, are active.* [Citation.] Moreover, sheriffs and district attorneys are officers created by the Constitution. . . . [I]t is at once evident that 'supervision' does not contemplate control, and that sheriffs and district attorneys cannot avoid or evade the duties and responsibilities of their respective offices by permitting a substitution of judgment." (*Id.* at p. 28, italics added.) Indeed, because counties are political subdivisions of the state, they are frequently subject to state supervision; this does not nullify the responsibilities they bear or the autonomy they enjoy.

The status of district attorneys as county officers finds confirmation in other constitutional and statutory provisions that further distinguish this case from *McMillian.* The *McMillian* court found it significant that the sheriff must "attend upon" the state courts in his county, and a judge, who is a state officer, may order sheriffs to take certain actions even if the judge sits in a distant county. (*McMillian, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739].) As the court explained, many judicial circuits in Alabama contain more than one county. (*Id.* at p. __, fn. 6 [117 S.Ct. at p. 1739].) In contrast, here in California each county has its own superior court, and these courts have no appreciable authority to command the actions of a district attorney outside of the county in which they sit. The one exception, found in Government Code section 3073, involves the appointment of the district attorney of an adjoining county for purposes of impeachment of the local district attorney. But the fact that a county officer may on very rare occasion be obliged to perform extra-local duties does not transform him or her into a state officer.

Moreover, district attorneys in California, unlike sheriffs in Alabama, have their salaries fixed for them not by state law but by the county board of supervisors (Cal. Const., art. XI, § 1, subd. (b).) Both the board of supervisors and the district attorney derive their power not from the Governor or the Attorney General but from the county electorate, which has the power not only to elect them, but, also recall them if it is unsatisfied with their performance. (Elec. Code, § 11200 et seq.) These provisions demonstrate that district attorneys' constitutional and statutory designation as county officers is not a mere nominal reality, but reflects the fact that both their source of power and their jurisdiction are located in the county rather than the state.

The *McMillian* court also found significance in the fact that an Alabama sheriff is not controlled by the governing body of the county. (See *McMillian, supra,* 520 U.S. at p. __ [117 S.Ct. at p. 1739].) It is true that a

California district attorney is also not controlled appreciably by the county's governing body, the board of supervisors. But the fact that the district attorney is independent of the board does not mean he or she is not a county officer. It simply means that under article XI, section 1, subdivision (b) of the California Constitution and Government Code section 24000, political power within the county is not vested exclusively in the board of supervisors, but is diffused among various public offices. The district attorney is constitutionally and statutorily responsible for county law enforcement.

The court's decision in *Pembaur* v. *Cincinnati* (1986) 475 U.S. 469 [106 S.Ct. 1292, 89 L.Ed.2d 452]supports the principle that a district attorney can be an autonomous county policymaker whose decisions can cause the county to incur section 1983 liability. In *Pembaur*, the court considered whether the forcible entry of sheriffs' deputies into the plaintiff's office could be a basis for a county's liability under section 1983. The Court of Appeals had concluded that this single instance of alleged misconduct could not be considered a county policy and therefore the county could not be held liable. The United States Supreme Court reversed, holding that because the deputies' actions had been authorized by the county prosecutor, who, under Ohio law "could establish county policy under appropriate circumstances," such actions could constitute official county policy. (*Id.* at p. 484 [106 S.Ct. at p. 1301].) Implicit in *Pembaur* is the assumption that county prosecutors and district attorneys may be viewed as independent *county* policymakers, and that their very autonomy from the county governing body establishes them as such.

The cases from other states cited by the majority in support of their position are readily distinguishable. For example, in Oklahoma and Mississippi the district attorney is paid directly by the state and his or her employees are classified as state employees. (See *Arnold* v. *McClain* (10th Cir. 1991) 926 F.2d 963, 965-966 [citing *Laidley* v. *McClain* (10th Cir. 1990) 914 F.2d 1386, 1390]); *Chrissy F. by Medley* v. *Mississippi DPW* (5th Cir. 1991) 925 F.2d 844, 849.) In Georgia and Colorado district attorneys generally represent a judicial district that encompasses more than one county and therefore cannot be considered simply as county policymakers. (*Owens* v. *Fulton County* (11th Cir. 1989) 877 F.2d 947, 951; *Rozek* v. *Topolnicki* (10th Cir. 1989) 865 F. 2d 1154, 1158.) In California, to the contrary, the district attorney is considered a county officer, is paid by the county, and has his or her jurisdiction limited by the county. The foregoing cases therefore do not support the majority's position with respect to the district attorney's position under California law.

The majority recognize that a district attorney might be liable as a county officer for "action or inaction related to hiring or firing an employee,

workplace safety conditions, procuring office equipment, or some other administrative function . . . unrelated to the prosecution of state criminal law violations." (Maj. opn., *ante*, at p. 363.) But the majority state that since "in California a district attorney represents the state when preparing to prosecute and when prosecuting criminal violations of state law," so "it logically follows that [the district attorney] also represents the state, and not the county, when training and developing policy . . . ." (*Id.* at p. 362.)

I disagree. The distinction that confuses the majority flows from the dual nature of the district attorney as both a local officer and a representative of the state in individual cases. In fact, section 1983 is directed at "persons," including local government entities, that act "under color of . . . *State*" law. A county performs numerous functions delegated to it by the state. (See, e.g., *County of San Diego* v. *State of California* (1997) 15 Cal.4th 68 [61 Cal.Rptr.2d 134, 931 P.2d 312].) In these cases, as in many others, the county is both an extension of the state *and* a local policymaker implementing the state's statutes and regulations. Given the fact that section 1983 excludes the state from liability, it seems inevitable that we must parse with some precision the functions of a local government entity that serves both as an agent of the state and a local policymaker in order to determine when the entity is acting in the latter capacity.

Accordingly, there is no insurmountable analytical difficulty to concluding that a county cannot be held liable under section 1983 when the district attorney or one of his or her deputies, as an agent of the state, commits prosecutorial misconduct, but can be held liable when the district attorney's hiring, training and supervision program, which the district attorney undertakes as a local policymaker, results in injury to a person's civil rights. This distinction is congruent with section 1983 jurisprudence, wherein it is held that in order for a government entity to be found liable for the actions of its employees, some sort of custom or policy is required, and a single instance of misjudgment or malfeasance on an employee's part is insufficient. (*Bd. of County Com'rs of Bryan County, Okl.* v. *Brown* (1997) 520 U.S. 397, \_\_-\_\_ [117 S.Ct. 1382, 1389-1390, 137 L.Ed.2d 626].) Thus, at least three courts from out-of-state jurisdictions have come to the conclusion that when district attorneys engage in training, supervision or other managerial matters over which they have local control, they act as county officers, not as a representatives of the state. (*Walker* v. *City of New York* (2d Cir. 1992) 974 F.2d 293, 301; *Gobel* v. *Maricopa County* (9th Cir. 1989) 867 F.2d 1201, 1209; *Crane* v. *State of Tex.* (5th Cir. 1985) 759 F.2d 412, 429.)

In sum, California recognizes the district attorney constitutionally and by statute as a county official who possesses considerable local autonomy.

There is no historical parallel in California to the constitutional developments that occurred in Alabama with respect to sheriffs and that the *McMillian* court found so significant. Also unlike the sheriff in Alabama, the district attorney in California has his or her compensation set by the county and with rare exceptions has his or her jurisdiction limited to the county. He or she is elected and may be recalled by the county electorate. I therefore conclude on balance that when the district attorney engages in activities in which he or she acts to set local policy, such as training staff, he or she should be considered a county officer for purposes of section 1983 liability. In the present case, in which plaintiffs claim that the injuries they suffered from being falsely accused and prosecuted for sexual abuse crimes were due, in part, to the inadequate training of the district attorney's investigators, I would allow them to proceed with their claims against the county.

I emphasize the heavy burden that plaintiffs bear in proving that their injuries resulted from a policy within the district attorney's office, as opposed to the misfeasance, malfeasance, or negligence of individual members of that office: They must establish a pattern of action that amounts to a custom or policy of deliberate indifference to their civil rights. (See *Canton v. Harris* (1989) 489 U.S. 378 [109 S.Ct. 1197, 103 L.Ed.2d 412]; *Bd. of County Com'rs of Bryan County, Okl. v. Brown, supra*, 520 U.S. 397.) But if such a custom or policy did exist and caused plaintiffs' injuries, they should be entitled to some relief under section 1983.

Kennard, J., concurred.