[No. C047380. Third Dist. Sept. 13, 2005.]

LORING BRUNIUS et al., Cross-complainants and Appellants, v. JOHN PARRISH et al., Cross-defendants and Respondents.

COUNSEL

Law Office of Freda D. Pechner and Freda D. Pechner for Cross-complainants and Appellants.

Bill Lockyer, Attorney General, Tom Greene and Mary E. Hackenbracht, Assistant Attorneys General, and Ralph J. Venturino, Deputy Attorney General, for Cross-defendants and Respondents.

OPINION

**SIMS, Acting P. J.**—In response to a complaint filed by the People of the State of California ex rel. Controller Steve Westly, to recover surface mine inspection costs from mine operators pursuant to the Surface Mining and Reclamation Act of 1975 (Pub. Resources Code, § 2710 et seq. (SMARA)),[1] defendants/cross-complainants Loring Brunius and Thelma Brunius, doing business as Sierra Rock, filed a cross-complaint, alleging violation of civil rights (42 U.S.C. § 1983),[2] against cross-defendants—the State Mining and Geology Board (the Mining Board), Mining Board members (Brian Baca, Robert Griego, Larry Fanning, Robert Hablitzel, Julian C. Isham, Allen M. Jones, Richard Ramirez, and Robert Tepel), Mining Board agent Stephen Testa, and Mining Board employee John Parrish. The trial court sustained cross-defendants' demurrer to the cross-complaint on the ground that the state and its officers are immune from section 1983 claims. Cross-complainants appeal from the judgment dismissing their cross-complaint, contending cross-defendants were acting as county actors under SMARA rather than state actors at the time in question. We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 2003, a complaint for recovery of surface mine inspection costs was filed by the People of the State of California ex rel. Controller Steve Westly, on behalf of the Mining Board, pursuant to section 2774, subdivision (b) (which makes mining operators responsible for inspection costs), and Government Code section 12418 (which authorizes the Controller to institute

---

[1] Undesignated statutory references are to the Public Resources Code, except section 1983 of title 42 of the United States Code (section 1983).

[2] Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

suits to collect money due the state). The complaint named as defendants the cross-complainants who filed this appeal and others who are not parties to this appeal. The complaint alleged the Mining Board is a nine-member state board within the Department of Conservation, which is an executive agency in the State Resources Agency. (§§ 601, 660; Gov. Code, § 12805.) The complaint alleged the Mining Board "is charged with, among other things, representing the State's interest in the development, utilization, and conservation of the mineral resources of the State, the reclamation[3] of mined lands, and the maintenance of an adequate surface mining and reclamation policy. (§ 672.) In this matter, the [Mining Board] was acting as the lead agency in El Dorado County pursuant to [SMARA]." The complaint alleged defendants/cross-complainants owed $24,005 for inspections conducted in November 2000, January 2001, and February 2002.

Cross-complainants filed an answer denying responsibility for the inspection costs and a cross-complaint for violation of civil rights under title 42 United States Code section 1983. The cross-complaint alleged as follows:

The Mining Board at all pertinent times was "acting as the local lead agency" under SMARA and acted under color of state law. Testa was an agent of the Mining Board, acting under color of law and in the scope of his agency, and is sued in both his individual and official capacities. By engaging in "some of the conduct described here," Testa exceeded the authority vested in him as an agent of the Mining Board, while "other described conduct" was at the direction of the Mining Board and the other cross-defendants. Parrish was an employee of the Mining Board, acting under color of law and in the scope of his employment, and is sued in both his individual and official capacities. Some (unspecified) conduct by Parrish was at the direction of the Mining Board, while other (unspecified) conduct exceeded his authority. The other individual cross-defendants were members of the Mining Board.

"Cross-Defendants, and each of them, have intentionally treated Cross-complainants differently from others similarly situated, in that Cross-Defendants have claimed that certain aspects of Cross-complainants' quarry operations, at the Weber Creek Quarry and Diamond Quarry, located in El Dorado County, were in 'violation' of various laws and regulations applicable to California mines, and, based upon such alleged 'violations', have undertaken punitive actions against Cross-complainants, including, but not limited to, orders demanding that Cross-complainants cease and desist from operating

---

[3] "Reclamation" means "the combined process of land treatment that minimizes water degradation, air pollution, damage to aquatic or wildlife habitat, flooding, erosion, and other adverse effects from surface mining operations, including adverse surface effects incidental to underground mines, so that mined lands are reclaimed to a usable condition which is readily adaptable for alternate land uses and create no danger to public health or safety." (§ 2733.)

the quarries, imposition of millions of dollars in administrative penalties, and the refusal to consider any evidence produced by Cross-complainants demonstrating that their mine operations were not in violation of any laws or regulations. [Cross-]Defendants, and each of them, have not undertaken similar actions against any other similarly situated quarry, and there is no rational basis for the difference in treatment between Cross-complainants' quarries and such other similarly situated quarries. The conduct of cross-Defendants, and each of them, is in violation of the equal protection clause of the Fourteenth Amendment, as such conduct is, and was, irrational, intentional and wholly arbitrary discrimination, by the improper execution of applicable statutes and laws, through duly constituted agents."

The cross-complaint sought compensatory and punitive damages, attorney's fees, and such other relief as the court may deem proper.

In March 2004, cross-defendants filed a motion to strike punitive damages and a demurrer that argued, among other things, the cross-complaint was invalid in that the state, its agencies and officials are not subject to liability under 42 United States Code section 1983, because section 1983 imposes liability on "person[s]," and federal and state case law holds that states and their agencies and officials acting in their official capacity are not "persons" for section 1983 purposes.[4]

Cross-complainants filed an opposition that did not address the critical issue of state immunity from a section 1983 suit.

The trial court sustained the demurrer without leave to amend, on the following grounds: The Mining Board is immune from prosecution under 42 United States Code section 1983 because the state is not a "person" subject to liability under section 1983. The same immunity barred suit against the individual cross-defendants who were alleged to have acted only in their official capacities. Although Testa and Parrish were alleged to have also acted under color of state law in their individual capacities, the only acts alleged were the imposition of the inspection costs and other actions that by their very nature were actions of the state only, not the individuals. Cross-complainants failed to allege any invidious discrimination. The allegation that

---

[4] Oddly, although the demurrer sought dismissal for all cross-defendants, the demurrer stated it was filed by the Attorney General as attorney *only* for the Mining Board, Parrish, and Testa (and the People). Thus, the Attorney General was not representing the individual members of the Mining Board. The opposition to the demurrer noted this problem. The reply stated all cross-defendants were moving for demurrer, but the reply did not address the limited representation of the Attorney General. We need not address this matter, because the trial court entered judgment dismissing the cross-complaint as to all cross-defendants, and cross-complainants do not make an issue of this matter on appeal.

similarly situated quarries were not prosecuted for inspection costs did not suffice to allege a section 1983 violation. Counsel's declaration offered no facts that would cure the defects. The court also granted the motion to strike punitive damages.

Cross-complainants appeal from the ensuing judgment dismissing the cross-complaint.

## DISCUSSION

### I. *Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We review the complaint de novo to determine whether it alleges facts stating a cause of action under any legal theory. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### II. *Immunity*

Cross-complainants assert the issue on appeal is whether the state's immunity from being sued under 42 United States Code section 1983 protects state entities from section 1983 liability solely by virtue of their mere *status* as a state board and their mere *status* as members and agents of that state board, despite the fact that, pursuant to the California statutory scheme, they functioned as county actors. Cross-complainants acknowledge the Mining Board is a state agency, but they argue "the one activity that gives rise to this litigation [is] the act of the [Mining Board] in performing inspections pursuant to the county's SMARA authority."

We agree with cross-defendants, however, that SMARA specifically provides for the state, through the Mining Board, to take back the regulatory powers previously delegated to a local agency when, as here, the local government is not properly administering the state statutory program. In taking over direct regulation of the mines in a county, the Mining Board not only retains its status as a state agency, but functions as one as well, just as SMARA contemplates.

Both sides on appeal complain the other side is making arguments that were not made in the trial court. However, even assuming the arguments were not tendered in the trial court, they present questions of law that do not

turn on disputed facts, and we may consider new theories on appeal from the sustaining of a demurrer. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [230 Cal.Rptr. 192].)

A. *Section 1983*

■ "Neither states nor state officials acting in their official capacities are 'person[s]' within the meaning of 42 United States Code section 1983 when sued for damages. (*Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 71, fn. 10 [105 L.Ed.2d 45, 109 S.Ct. 2304] [(*Will v. Michigan*)]) [Citation.]" (*Pitts v. County of Kern* (1998) 17 Cal.4th 340, 348 [70 Cal.Rptr.2d 823, 949 P.2d 920] (*Pitts*) [issue of whether district attorney was policymaker for the county was one of law, and state law supported conclusion that district attorney represented the state, not the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas].) " '[T]he State and arms of the State . . . are not subject to suit under [section] 1983 in either federal court or state court.' " (*Id.* at p. 348, citing *Howlett v. Rose* (1990) 496 U.S. 356, 365 [110 L.Ed.2d 332, 110 S.Ct. 2430] and *Will v. Michigan, supra*, 491 U.S. at pp. 63–64, 71, fn. 10 [105 L.Ed.2d 45].) In construing section 1983, the United States Supreme Court said the states' Eleventh Amendment[5] immunity from suit in federal courts was a separate issue, but it was a consideration. (*Will v. Michigan, supra*, 491 U.S. at pp. 66–67 [105 L.Ed.2d 45].) Another consideration was the common law doctrine of sovereign immunity, pursuant to which a state cannot be sued in its own courts without its consent. (*Ibid.*) If an entity enjoys Eleventh Amendment immunity, it is also immune from suit under section 1983, even in state court. (*Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1103 [100 Cal.Rptr.2d 289] [school district was arm of state and therefore immune from section 1983 suit].)

While state officials literally are "persons," a suit against a state official in his or her official capacity[6] is not a suit against the official but rather is a suit

---

[5] The Eleventh Amendment to the United States Constitution states: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

[6] We address separately, *post*, the allegations that two of the cross-defendants acted in personal as well as official capacities.

Though not acknowledged by *Pitts, supra*, 17 Cal.4th at page 350, the cited United States Supreme Court case (*Will v. Michigan, supra*, 491 U.S. 58) was somewhat affected by *Hafer v. Melo* (1991) 502 U.S. 21 [116 L.Ed.2d 301, 112 S.Ct. 358], which "eliminate[d] [an] ambiguity" in *Will* and held the phrase " 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." (*Hafer v. Melo, supra*, 502 U.S. at pp. 26–27.) The distinction between official-capacity and personal-capacity suits is more than a mere pleading

against the official's office, and therefore it is no different from a suit against the state itself. (*Pitts, supra*, 17 Cal.4th at p. 350, citing *Will v. Michigan, supra*, 491 U.S. at p. 71.)

■ In contrast, local governments, including counties, are subject to suit under 42 United States Code section 1983, where the allegedly unconstitutional action implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or governmental custom. (*Pitts, supra*, 17 Cal.4th at pp. 348–349, citing *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 663, 690 [56 L.Ed.2d 611, 98 S.Ct. 2018] and *McMillian v. Monroe County* (1997) 520 U.S. 781, 785–786 [138 L.Ed.2d 1, 117 S.Ct. 1734].)

"The availability of immunity from liability under section 1983 in state court is governed by federal, not state, law. [Citation.]" (*Pitts, supra*, 17 Cal.4th at p. 350.) However, in determining whether an officer is a state or county actor, the court must examine state law to determine whether the particular acts the official is alleged to have committed fall within the range of state or county functions. (*Id.* at p. 352, citing *McMillian v. Monroe County, supra*, 520 U.S. at pp. 785–786 [138 L.Ed.2d 1].)

## B. *SMARA*

We find persuasive cross-defendants' analysis that they functioned at all times as state actors.

The background of SMARA was recently set forth in *People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971 [32 Cal.Rptr.3d 109, 116 P.3d 567], a case involving Brunius's quarries, which held the Director of the Department of Conservation had standing to file a petition for writ of mandate challenging reclamation plans and financial assurances for surface mining operations approved by El Dorado County. The opinion described the statutory background as follows:

■ " 'Within the Resources Agency is the Department of Conservation (the Department). The head of the Department is an executive officer appointed by the Governor, known as the Director, (§ 601.) The Department's work is divided into at least four divisions: mines and geology; oil, gas, and geothermal resources; land conservation; and recycling. (§ 607.)

---

device. (*Id.* at p. 27.) State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the identity of the government that employs them. (*Ibid.*) By contrast, officers sued in their personal capacity come to court as individuals. (*Ibid.*) A government official in the role of personal-capacity defendant is a "person" under section 1983. (*Hafer v. Melo*, at p. 27.) None of the parties on appeal cites *Hafer.*

" 'Also in the Department is the nine-member State Mining and Geology Board. (§ 660.) . . . The Board represents the state's interests in the development, utilization, and conservation of mineral resources in California and the reclamation of mined lands, and in federal matters pertaining to mining. The Board also determines, establishes, and maintains an adequate surface mining and reclamation policy. (§ 672.) Although the Director is the head of the Department, he does not control the Board; the Director has no power to amend or repeal any order, ruling, or directive of the Board. (§ 671.) [¶] . . . [¶]

■ · " 'The Legislature [in adopting SMARA] intended to create and maintain an effective surface mining and reclamation policy to prevent or minimize adverse environmental effects, reclaim mined lands to a usable condition which is ad[a]ptable to alternative uses, and encourage the production and conservation of minerals while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment. (§ 2712.)

" 'At the heart of SMARA is the requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).) . . . The financial assurances must remain in effect for the duration of the mining operation and until reclamation is complete and shall be made payable to the lead agency and the Department. (§ 2773.1, subd. (a)(2).) The financial assurances may be forfeited if the lead agency or the Board determines the operator is financially incapable of performing reclamation in accordance with the approved reclamation plan, or has abandoned its surface mining operation without commencing reclamation. (§ 2773.1, subd. (b).)

■ " 'In keeping with the recognition of the diverse conditions throughout the state, SMARA provides for "home rule," with the local lead agency having primary responsibility. A lead agency is usually the city or county. (§ 2728.) The mining operator submits the reclamation plan and financial assurances to the lead agency for review. (§§ 2770, subd. (d), 2772.) The Board, through regulations, specifies minimum statewide reclamation standards. (§ 2773.) A lead agency, however, may permit a mining operation to deviate from these standards, if necessary based on the approved end use. (Cal. Code Regs., tit. 14, § 3700.)

■ " 'To implement its review of proposed reclamation plans and financial assurances, every lead agency is to adopt ordinances in accordance with state policy. (§ 2774, subd. (a).) The Board shall review these ordinances and certify that they are in compliance with state policy. (§ 2774.3.) If the Board finds deficiencies in the lead agency's ordinance, the Board shall

communicate the deficiencies to the lead agency. (§ 2774.5, subd. (a).) After an opportunity to revise the ordinance to comply with state policy, if the Board finds the ordinance is still deficient, the Board shall assume full responsibility for review of reclamation plans. (§ 2774.5, subd. (b).) If the lead agency does not have a certified ordinance, reclamation plans shall be submitted to and approved by the Board. (§ 2774.5, subd. (c).) The Board may amend any reclamation plan that was approved by a lead agency at the time the lead agency's ordinance did not comply with state policy. (§ 2774.5, subd. (c).)

■■ " 'Prior to approving reclamation plans and financial assurances, the lead agency submits the proposals and all supporting documentation, including information from any document prepared, adopted or certified pursuant to CEQA,[7] to the Director for review. (§ 2774, subd. (c).) The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.

" 'If a lead agency fails to approve a reclamation plan or financial assurances, an appeal may be taken to the Board. (§ 2770, subd. (e).) [¶] As originally enacted, SMARA did not contain enforcement provisions. (Stats. 1975, ch. 1131, § 11, pp. 2793–2803.) As the author explained, SMARA did not contain enforcement provisions "because the bill provides for a local regulatory program. Enforcement provisions would be embodied in local ordinances."

■■ " 'In 1990, in response to concerns about deficiencies of lead agencies in carrying out their responsibilities under SMARA, the Legislature substantially amended SMARA. The amendments provided for various types of enforcement, against both mine operators and lead agencies. Enforcement against mine operators includes notices of violations and fines. (§ 2774.1, subds. (a)–(c).) The lead agency has primary responsibility for enforcing SMARA against mine operators. (§ 2774.1, subd. (f)(1).) Where the Board is not acting as the lead agency, the Director may initiate enforcement actions where (1) the Director has notified the lead agency of the violation and the lead agency fails to take action within 15 days, or (2) the Director determines the violation amounts to imminent and substantial endangerment to the public health or safety, or to the environment. (§ 2774.1, subd. (f)(1).) Similarly, the

---

[7] CEQA stands for the California Environmental Quality Act, section 21000 et seq.

Director may take actions to seek forfeiture of financial assurances where the lead agency has failed to act or has been unsuccessful. (§ 2773.1, subd. (d).)

▌ " 'Where the lead agency fails to fulfill its duties under SMARA, the Board may take over the powers of a lead agency, except for permitting authority. The Board may step in if it finds that a lead agency has: (1) approved reclamation plans and financial assurances that are not consistent with SMARA; (2) failed to inspect mines as required by SMARA; (3) failed to seek forfeiture of financial assurances to carry out reclamation; (4) failed to take appropriate enforcement actions; (5) intentionally misrepresented the results of inspections; or (6) failed to submit the required information to the Department. (§ 2774, subd. (a).) The Board may take over as lead agency where the lead agency fails to submit a copy of the mining permit for every surface mining operation within its jurisdiction by July 1, 1991, or fails to submit amendments to the permit or reclamation plans for such mines by July 1 of each subsequent year. (§ 2774, subd. (e).)' " (*People ex rel. Dept. of Conservation v. El Dorado County, supra,* 36 Cal.4th at pp. 983–986.)

Additionally, statutory provisions of interest to us in this appeal are the following:

▌ The Mining Board is a state board within the Department of Conservation, which is an executive agency in the State Resources Agency. (§§ 601, 660; Gov. Code, § 12805.) Mining Board members are appointed by the Governor, subject to Senate confirmation. (§ 660.) The Mining Board represents the state's interest in mining matters. (§ 672.)[8]

SMARA identifies the state's interest in surface mining, while acknowledging local interests. Thus, section 2711 provides: "(a) The Legislature hereby finds and declares that the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety.

"(b) The Legislature further finds that the reclamation of mined lands as provided in this chapter will permit the continued mining of minerals and will provide for the protection and subsequent beneficial use of the mined and reclaimed land.

---

[8] Section 672 provides: "The board shall represent the state's interest in the development, utilization, and conservation of the mineral resources of the state and the reclamation of mined lands, as provided by law, and federal matters pertaining to mining, and shall determine, establish, and maintain an adequate surface mining and reclamation policy."

"(c) The Legislature further finds that surface mining takes place in diverse areas where the geologic, topographic, climatic, biological, and social conditions are significantly different and that reclamation operations and the specifications therefor may vary accordingly." (See also, §§ 2726, 2727 [areas may have regional or statewide significance].)

Section 2712 provides: "It is the intent of the Legislature to create and maintain an effective and comprehensive surface mining and reclamation policy with regulation of surface mining operations so as to assure that:

"(a) Adverse environmental effects are prevented or minimized and that mined lands are reclaimed to a usable condition which is readily adaptable for alternative land uses.

"(b) The production and conservation of minerals are encouraged, while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment.

"(c) Residual hazards to the public health and safety are eliminated."

■■■  The Mining Board establishes state policy for the conduct of mining operations and the reclamation of mined lands. (§ 2755 ["The board[9] shall adopt regulations that establish state policy for the reclamation of mined lands"].)

■■■  SMARA allows local agencies, such as counties, to become "[l]ead agenc[ies]" for the enforcement of the state's policy, but the Mining Board itself may also be a lead agency. (§ 2728 ["Lead agency" means "the city, county . . . or the board which has the principal responsibility for approving a surface mining operation or reclamation plan pursuant to this chapter"].)

■■■  The state policy established by the Mining Board is put into effect by the local lead agencies. (§ 2756.)[10] The state policy does not include matters that are solely of local concern, such as noise, dust, etc. (§ 2757.)[11]

---

[9] "Board" means the Mining Board. (§§ 2008, 2001.)

[10] Section 2756 says, "State policy shall apply to the conduct of surface mining operations and shall include, but shall not be limited to, measures to be employed by lead agencies in specifying grading, backfilling, resoiling, revegetation, soil compaction, and other reclamation requirements, and for soil erosion control, water quality and watershed control, waste disposal, and flood control."

[11] Section 2757 provides: "The state policy adopted by the board shall be based upon a study of the factors that significantly affect the present and future condition of mined lands, and shall be used as standards by lead agencies in preparing specific and general plans, including the conservation and land use elements of the general plan and zoning ordinances. The state policy shall not include aspects of regulating surface mining operations which are

As indicated, to become a SMARA lead agency, the local agency must enact mining ordinances in accordance with SMARA that meet the Mining Board's approval. (§§ 2774, subd. (a),[12] 2774.3 [Mining Board shall review lead agency ordinances to assure they are in accordance with state policy].)

"The lead agency shall conduct an inspection of a surface mining operation within six months of receipt by the lead agency of the surface mining operation's report submitted pursuant to Section 2207, solely to determine whether the surface mining operation is in compliance with this chapter. . . . All inspections shall be conducted using a form developed by the department[13] and approved by the board. The operator shall be solely responsible for the reasonable cost of the inspection. The lead agency shall notify the director[14] within 30 days of the date of completion of the inspection that the inspection has been conducted." (§ 2774, subd. (b).)

■■■ Before accepting a surface mining operation's reclamation plan and financial assurances, the lead agency must submit them to the director for review. (§ 2774, subd. (c).) If the lead agency declines to act on comments from the director, the lead agency shall state its reasons in writing. (§ 2774, subd. (d).)

■■■ If a surface mining operation is not in compliance with SMARA, the lead agency or the director may give notice of the violation to the operator, order compliance, and impose penalties for failure to comply. (§ 2774.1) The lead agency or the Attorney General, on behalf of the director, may seek a court order enjoining operation of the mine if it presents imminent danger to the public health or the environment. (§ 2774.1, subd. (d).) Upon a complaint by the director, the department, or the board, the Attorney General may bring a court action to recover administrative penalties. (§ 2774.1, subd. (e).)

The lead agency has primary responsibility for enforcing SMARA under section 2774.1, subdivision (f), which provides: "The lead agency has primary responsibility for enforcing this chapter and Section 2207 [mining reports etc.]. In cases where the board is not the lead agency pursuant to Section 2774.4, enforcement actions may be initiated by the director pursuant

---

solely of local concern, and not of statewide or regional concern, as determined by the board, such as, but not limited to, hours of operation, noise, dust, fencing, and purely aesthetic considerations."

[12] Section 2774, subdivision (a), states: "Every lead agency shall adopt ordinances in accordance with state policy which establish procedures for the review and approval of reclamation plans and financial assurances and the issuance of a permit to conduct surface mining operations . . . ."

[13] "Department" means Department of Conservation. (§§ 2002, 2001.)

[14] "Director" means the Director of Conservation. (§§ 2002.5, 2001.)

to this section only after the violation has come to the attention of the director and either of the following occurs: [¶] (1) the lead agency has been notified by the director in writing of the violation for at least 15 days, and has not taken appropriate enforcement action. [¶] (2) The director determines that there is a violation which amounts to an imminent and substantial endangerment to the public health or safety, or to the environment. [¶] The director shall comply with this section in initiating enforcement actions."

██ If the Mining Board is not the lead agency for a jurisdiction, it may relieve the lead agency of its SMARA authority (but not its non-SMARA local powers) if the Mining Board finds the lead agency failed properly to enforce SMARA. Thus, section 2774.4 provides: "(a) If the board finds that a lead agency either has (1) approved reclamation plans or financial assurances which are not consistent with this chapter, (2) failed to inspect or cause the inspection of surface mining operations as required by this chapter, (3) failed to seek forfeiture of financial assurances and to carry out reclamation of surface mining operations as required by this chapter, (4) failed to take appropriate enforcement actions as required by this chapter, (5) intentionally misrepresented the results of inspections required under this chapter, or (6) failed to submit information to the department as required by this chapter, the board shall exercise any of the powers of that lead agency under this chapter, except for permitting authority." (See also, § 2715, subds. (a) & (f).)[15]

## C.   *Cross-defendants Are Immune from this Suit*

As indicated, cross-complainants do not dispute the Mining Board's status as a state agency. Instead, they argue such status is irrelevant because cross-defendants, by assuming the county's SMARA authority, were functioning as county actors. We shall conclude cross-complainants fail to show grounds for reversal.

Cross-complainants cite an unpublished opinion of this court, involving the same parties to this litigation, because the unpublished opinion (which held the trial court acted within its discretion in denying the Mining Board's motion for a preliminary injunction to enjoin mining operations until financial assurances were provided) stated as background that the Mining Board assumed the inspection role under SMARA. We need not address cross-complainants' undeveloped argument that this unpublished opinion is relevant under the doctrines of res judicata and collateral estoppel. We assume for

---

[15] Section 2715 provides: "No provision of this chapter or any ruling, requirement, or policy of the board is a limitation on any of the following: [¶] (a) On the police power of any city or county or on the power of any city or county to declare, prohibit, and abate nuisances. [¶] . . . [¶] (f) On the power of any city or county to regulate the use of buildings, structures, and land as between industry, business, residences, open space . . . and other purposes."

purposes of this appeal that the Mining Board assumed the inspection role, because the People's complaint sued to recover the inspection costs incurred by the Mining Board. Additionally, we accept for purposes of this appeal the admission by the Mining Board in its appellate brief, that it first took over the County's SMARA inspection powers and then subsequently assumed all of the County's SMARA regulatory powers.

■■■ We agree with cross-defendants that SMARA (as described *ante*) provides for the state, through the Mining Board, to take back the regulatory powers previously delegated to a local lead agency when the local government is not properly administering the state policy, and in doing so, the Mining Board not only retains its status as a state agency, but functions as one as well. Cross-defendants at all times were enforcing state policy, not local policy.

Having based their opening brief on the assumption that cross-defendants would rely on mere status rather than function, cross-complainants reply this is a new position unsupported by authority or citation to the record. We disagree. The SMARA statutes we described *ante* reflect cross-defendants at all times were enforcing state policy, not local policy. Local governments such as counties are subject to suit under 42 United States Code section 1983, where the allegedly unconstitutional action implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers, or governmental custom. (*Pitts, supra,* 17 Cal.4th at pp. 348–349, citing *Monell v. New York City Dept. of Social Services, supra,* 436 U.S. at pp. 663, 690 [56 L.Ed.2d 611] and *McMillian v. Monroe County, supra,* 520 U.S. at pp. 785–786 [138 L.Ed.2d 1].)

Here, it does not appear that any local government policy or local custom is at issue.

■■■ Cross-complainants argue it does not matter that the Mining Board is a state agency, because the critical question for Eleventh Amendment immunity is whether the entity was an "arm of the State." Cross-complainants cite case law addressing whether local entities were "like an arm of the State" so as to qualify for Eleventh Amendment immunity. (E.g., *Lynch v. San Francisco Housing Authority* (1997) 55 Cal.App.4th 527, 534 [65 Cal.Rptr.2d 620] (*Lynch*).) *Lynch* said even if an entity is a state agency, there remains the question whether the particular state agency had the same kind of independent status as a county or was instead an arm of the state and therefore immunized by the Eleventh Amendment. (*Id.* at pp. 535–536, citing *Regents of the Univ. of Cal. v. Doe* (1997) 519 U.S. 425, 429–430 [137 L.Ed.2d 55, 117 S.Ct. 900] [fact that university would be indemnified by federal government for litigation costs did not divest university of its Eleventh Amendment immunity].)

However, in this case the Mining Board was both a state agency and an arm of the state.

■ Cross-complainants devote most of their opening brief to the distinct question of individual immunities, i.e., that individual defendants have prosecutorial immunity when acting in a prosecutorial or judicial function, but not when they perform an investigative function. In such cases, function rather than status is the key. However, although individual immunity was one of the issues raised in the demurrer, it is a different issue than the state exemption issue that was separately raised in the demurrer and that we find dispositive. Personal immunities are unavailable as defenses in official-capacity actions, where the only immunities are " 'forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.' " (*Pitts, supra*, 17 Cal.4th at p. 350.) Cross-complainants cite no authority divesting a state of its state sovereign immunity because it acts in ways that can be characterized as investigative.

We conclude immunity bars the 42 United States Code section 1983 suit against the Mining Board and the individual cross-defendants insofar as they were being sued in their official capacities.

■ The cross-complaint alleged liability against Testa and Parrish in their individual as well as their official capacities. (Cross-defendants state Parrish was the Mining Board's executive officer, and Testa was a contract employee.) The trial court stated in part: "Although [Testa and Parrish] are alleged to have acted under color of state law in their individual capacities, the only acts alleged are the imposition of the inspection costs and other actions which by their very nature are actions of the state only, not the individuals." Cross-complainants fail to address this point and fail to present any argument to preserve the cross-complaint against Testa and Parrish in their individual capacities. It is the appellant's affirmative burden to demonstrate error. (*Denham v. Superior Court* (1970) 2 Cal.3d. 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) We therefore conclude cross-complainants have forfeited any claims against cross-defendants in their individual capacities.

We conclude cross-defendants are immune from this 42 United States Code section 1983 cross-complaint, and the demurrer was properly sustained. Cross-complainants proffer no amendment that would save the pleading. We need not address the issue of invidious discrimination or the cross-complainants' challenge to the trial court's grant of the motion to strike punitive damages.

## DISPOSITION

The judgment dismissing the cross-complaint is affirmed. Cross-defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Nicholson, J., and Butz, J., concurred.