OPINION
THOMAS, Circuit Judge:
We consider in this case whether a district attorney acts as a local or a state official when establishing policy and training related to the use of jailhouse informants. We find that, as to the policies at issue here, the district attorney was acting as a final policymaker 'for the County of Los Angeles. We thus reverse the district court’s grant of the motion for judgment on the pleadings and remand the case.[1]
I
Thomas Goldstein spent 24 years in prison after being convicted for murder based largely upon the perjured testimony of an unreliable jailhouse informant, the aptro-nymic Edward Fink. Van de Kamp v. Goldstein, 555 U.S. 335, 339, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009); see also Thompson v. Calderon, 120 F.3d 1045, 1053-1054 (9th Cir.1997) (describing Fink as a “perennial informant,” and describing his exploits in some detail), rev’d, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).
Fink was a heroin addict and convicted felon who had previously received reduced sentences by testifying in other cases and received a reduced sentence in exchange for his testimony against Goldstein. Goldstein v. Superior Court, 45 Cal.4th 218, 85 Cal.Rptr.3d 213, 195 P.3d 588, 590 (2008). Some prosecutors in the Los Angeles County District Attorney’s office allegedly knew about Fink’s history, but failed to inform the prosecutors trying Goldstein’s case or Goldstein’s counsel that Fink had testified before or that he received a benefit for testifying against Goldstein, and *752 Fink lied on the stand when he was asked about previous assistance given or benefits received. Van de Kamp, 555 U.S. at 339, 129 S.Ct. 855.
Goldstein was convicted almost solely on the basis of Fink’s testimony. The California Supreme Court explained the evidence against Goldstein:
In 1979 Goldstein was an engineering student and Marine Corps veteran with no criminal history. He became a murder suspect after an eyewitness to an unrelated shooting saw the gunman enter Goldstein’s apartment building. No witness or forensic evidence connected Goldstein with the murder victim, but Long Beach police detectives showed Goldstein’s photograph, among others, to Loran Campbell, an eyewitness to the homicide. Campbell did not recognize anyone in the photo lineup, and Gold-stein did not match Campbell’s description of the suspect. However, a detective asked if Goldstein could have been the person Campbell saw running from the scene. Campbell said it was possible, though he was not certain.
Goldstein was arrested and placed in a jail cell with Edward Floyd Fink, a heroin addict and convicted felon. At Gold-stein’s trial, Fink testified that Goldstein said he was in jail because he shot a man in a dispute over money.
Goldstein v. Superior Court, 45 Cal.4th 218, 85 Cal.Rptr.3d 213, 195 P.3d 588, 590 (2008). Campbell later recanted his identification of Goldstein, leaving Fink’s testimony as the basis for the conviction. Id.
In 1998, Goldstein filed a habeas petition in the Central District of California. Van de Kamp, 555 U.S. at 339, 129 S.Ct. 855. At an evidentiary hearing, the district court agreed that Fink had lied and that it might have made a difference “if the prosecution had told Goldstein’s lawyer that Fink had received prior rewards in return for favorable testimony!.]” Id. at 339, 129 S.Ct. 855. The court ordered the state to grant Goldstein a new trial or release him, and the Court of Appeals affirmed. Id. The state decided to release Goldstein, who had already served 24 years of his sentence. Id.
Goldstein then filed this action under 42 U.S.C. § 1983. Id. at 340, 129 S.Ct. 855. As relevant here, Goldstein claims that the Los Angeles County District Attorney’s Office failed to create any system for the Deputy District Attorneys handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information, and failed to train Deputy District Attorneys to disseminate this information. Goldstein explains that the district attorney’s office was on notice that jailhouse informants were falsely testifying and considered the creation of a system to track benefits provided jailhouse informants and other impeachment information, but failed to create any system.
In 2009, the United States Supreme Court addressed whether the Los Angeles County district attorney and chief deputy district attorney had absolute immunity from suit for Goldstein’s claims. While the Supreme Court “agreefd] with Goldstein that, in making these claims, he attacked] the office’s administrative procedures,” it concluded that “[t]hose claims focus upon a certain kind of administrative obligation— a kind that itself is directly connected with the conduct of a trial.” Van de Kamp, 555 U.S. at 344, 129 S.Ct. 855. Therefore, the Court held that the Los Angeles County district attorney and chief deputy district attorney were absolutely immune from Goldstein’s claims that the prosecution failed to disclose impeachment material due to a failure to properly train prosecutors, failed to properly supervise prosecutors, and failed to establish an information *753 system containing potential impeachment material about informants. Id. at 339, 129 S.Ct. 855.
On remand, the district court entered judgment in favor of Los Angeles County district attorney John Van de Kamp and chief deputy district attorney Curt Live-say.[2] As to the County of Los Angeles’ motion for judgment on the pleadings, the district court explained that this Court has not had occasion to address the claims at issue here, but “reluctantly concluded” that the district attorney acts on behalf of the state, rather than the county, in setting policy related to jailhóuse informants “in light of Weiner [v. San Diego County, 210 F.3d 1025 (9th' Cir. 2000)] and the two decisions of [the Northern District of California] construing it.” Therefore, the district court granted the County of Los Angeles’ motion for judgment on the pleadings.
We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review an order granting a motion for judgment on the pleadings de novo. Harris v. Cnty. of Orange, 682 F.3d 1126, 1131 (9th Cir.2012), For purposes of our review, “[a]ll material allegations in a complaint must be taken as true and viewed in the light most favorable to the plaintiff.” Geraci v. Homestreet Bank, 347 F.3d 749, 751 (9th Cir.2003).
II
“Pursuant to 42 U.S.C.'§ 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom.” Weiner v. San Diego Cnty., 210 F.3d 1025, 1028 (9th Cir.2000) (citing Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). “To hold a local government liable for an official’s conduct, a plaintiff must first establish that the official (1) had final policymaking authority concerning the action ... at issue and (2) was the policymaker for the local governing body for the purposes of the particular act.” Id. at 1028. (citing McMillian v. Monroe Cnty., 520. U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)). States and state officials acting in their official capacities cannot be sued for damages under Section 1983. Will v. Mich. Dep’t of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); see Ceballos v. Garcetti, 361 F.3d 1168, 1183 n. 11 (9th Cir.2004).
Here, all parties agree- that the district attorney is the relevant policymaker. Thus, the viability of Goldstein’s claim turns on whether the Los Angeles District Attorney acted here as a policymaker for the state or for the county. This determination is made on a function-by-function approach by analyzing under state law the organizational structure and control over the district attorney. See McMillian v. Monroe Cnty., 520 U.S. 781, 785-86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).
A,
In McMillian, the Supreme Court first set out the procedure to determine whether a policymaker acts on behalf of the state or local government. The case involved the sheriff of Monroe County, Alabama, and the Court sought to determine whether he acted as a state or local official when intimidating a witness into making false statements and suppressing exculpatory evidence. 520 U.S. at 784, 117 S.Ct. 1734. The Court was clear that the inquiry is not undertaken in a “categorical, ‘all or nothing’ manner,” but rather that the “cases on *754 the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.” Id. at 785, 117 S.Ct. 1734 (citations omitted).
The Court explained that the “inquiry is dependent on an analysis of state law.” Id. at 786, 117 S.Ct. 1734. It looked first to the Alabama Constitution, and concluded that “the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court strongly support Monroe County’s contention that sheriffs represent the State, at least for some purposes.” Id. at 787, 117 S.Ct. 1734. Alabama had taken specific steps both in its Constitution and statutes to increase state control over sheriffs and move the authority to impeach sheriffs “from the county courts to the State Supreme Court, because of the failure of county courts to punish officers for neglect of duty.” Id. at 788, 117 S.Ct. 1734 (citation and alterations omitted).
When looking to Alabama’s statutes, the Supreme Court explained that sheriffs must “attend upon” state courts in the county, “obey the lawful orders and directions” of state courts, and “execute and return the process and orders of any state court, even those outside his county.” Id. at 789, 117 S.Ct. 1734 (internal quotation marks and citation omitted). “[T]he presiding circuit judge exercise[s] a general supervision over the county sheriffs in his circuit, just as if the sheriffs are normal court [ie., state] employees.” Id. at 790, 117 S.Ct. 1734 (alterations in original) (internal quotation marks and citation omitted). “[M]ost importantly,” the Court explained, “sheriffs are given complete authority to enforce the state criminal law in their counties” and must report evidence of crimes to the district attorney (who is, in Alabama, a state official), while the counties have no powers of law enforcement. Id. The governor and attorney general can “direct the sheriff to investigate any alleged violation of law in their counties,” and the sheriff must “promptly” complete the investigation and write a report to the state official. M at 791, 117 S.Ct. 1734 (internal quotation marks and citations omitted). Finally, the Court noted that “the salaries of all sheriffs are set by the state legislature, not by the county commissions.” Id. (citation omitted).
On the other hand, the Supreme Court explained that “the sheriffs salary is paid out of the county treasury,”[3] “the county provides the sheriff with equipment (including cruisers),” “the sheriffs jurisdiction is limited to the borders of his county,” and “the sheriff is elected locally by the voters in his county.” Id. (internal quotation marks and citation omitted). The Court noted but found “little merit” in the fact that the county coroner fills temporary vacancies in the sheriffs office, the sheriff is indicated in the code among “county officials” or “county employees,” and that the Monroe County Commission’s insurance policy may cover “some, but not all” of the claims against the Sheriff in this case. Id. at 792 n. 7, 117 S.Ct. 1734. The Court “d[id] not find these provisions sufficient to tip the balance in favor of petitioner” because the county commission’s influence over the sheriffs operations was only “attenuated and indirect.” Id. at 792, 117 S.Ct. 1734..
Therefore, the Supreme Court concluded that “the weight of the evidence is *755 strongly on the side of the conclusion” that “Alabama sheriffs, when executing their law enforcement duties, represent’ the State of Alabama, not their counties.” Id. at 793,117 S.Ct. 1734.
B
Based on our analysis of the relevant California constitutional and statutory provisions, we conclude that California district attorneys act as local policymakers when adopting and implementing internal policies and procedures related to the use of jailhouse informants.
We begin by examining district attorneys’ place within the structure of government, and then by looking at the constitutional and statutory provisions relevant to power and duties of district attorneys within their counties, as well as the control the California Attorney General and the county boards of supervisors exercise over them. Our task, of course, is not merely to weigh the amount of control that the Attorney General and county board of supervisors possess over a district attorney; instead, we must decide whether the district attorney was acting on behalf of the state or the county.
As to governmental structure, “[t]he officers of a county [include] [a] district attorney.” Cal. Gov.Code § 24000. This is also reflected in Article XI of the California Constitution, “Local Government,” under which “[t]he Legislature shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county.” Cal. Const. art. XI, § 1(b). Additionally, a district attorney must be a registered voter of the county in which he or she is elected, Cal. Gov.Code § 24001, and is elected by the voters of the county, Cal. Gov.Code § 24009. A district attorney may be removed from office by the same procedure as for other city and county officials. Cal. Gov.Code § 3073.
Though these structural provisions provide a helpful starting point for our analysis, the state’s label of the district attorney as a county official informs but of course cannot determine the result of our functional inquiry. See McMillian, 520 U.S. at 792 n. 7, 117 S.Ct. 1734 (finding “little merit” in the fact that the sheriff is indicated in the code among “county officials” or “county employees”). For our more specific inquiry, we focus on district attorneys’ roles vis-a-vis the state . Attorney General and the county board of supervisors.
First, Article V, Section 13 of the California Constitution states:
Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State. It shall be the duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced. The Attorney General shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney’ General to prosecute any violations of law of which the superior court, shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, the Attorney General *756 shall assist any district attorney in the discharge of the duties of that office.
Cal. Const, art. V, § 13.
We have already analyzed Article V, Section 13 of the California Constitution as it relates to sheriffs’ supervision by the Attorney General, and concluded that despite this provision, sheriffs are county officers for the purposes of investigation. Brewster v. Shasta Cnty., 275 F.3d 803, 805 (9th Cir.2001). We cautioned that significant “reliance on Article V, section 13, would prove too much.” Id. at 809. “Under this provision, if taken to its logical extreme, all local law enforcement agencies in California would be immune from prosecution for civil rights violation, thereby rendering meaningless the decision in Monell, which preserves § 1983 actions against local governments.” Bishop Paiute Tribe v. Cnty. of Inyo, 291 F.3d 549 (9th Cir.2002), vacated on other grounds by Inyo Cnty. v. Paiute-Shoshone Indians, 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). Instead, “[s]uch general law enforcement authority ‘does not contemplate absolute control and direction’ of the officials subject to the Attorney General’s supervision.” Brewster, 275 F.3d at 809 (citing People v. Brophy, 49 Cal.App.2d 15, 120 P.2d 946, 953 (1942) (“[I]t is at once evident that “supervision” does not contemplate control....”)); see also Pitts v. Cnty. of Kern, 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920, 939 (1998) (Mosk, J., dissenting) (explaining that Brophy’s analysis of the California Constitutional provision “is still good law”).[4]
Though the Attorney General “shall have direct supervision over every district attorney and sheriff,” the Attorney General’s control over the district attorney is quite limited: he or she is limited to requiring a district attorney to “make reports.” Cal. Const. art. V, § 13; see Cal. Gov.Code § 12550. The Attorney General may also “call into conference the district attorneys” “for the purpose of discussing the duties of their respective offices.” Cal. Gov.Code § 12524. This falls far short of a power to dictate policy to district attorneys statewide, and is in contrast to the sheriffs’ role in McMillian in which the governor and attorney general could “direct the sheriff to investigate any alleged violation of law in their counties,” and the sheriff had to “promptly” complete the investigation and write a report to the state official. McMillian, 520 U.S. at 791, 117 S.Ct. 1734 (internal quotation marks and citations omitted).
Further, unlike in McMillian, there was no significant constitutional or statutory change that makes clear a trend to place district attorneys under state control. See id. at 788, 117 S.Ct. 1734. Instead, when Article V, Section 13 was proposed in 1934, it had as its goal efficiency and horizontal coordination, rather than a desire to weaken district attorneys or give the Attorney *757 General additional power. See 1934 Proposed Amendments to Constitution, Propositions and Proposed Laws at 9 (“[T]he manner in which the Dillingers, the ‘Baby Face’ Nelsons, the Machine Gun Kellys, the Tuohys [sic] and numerous other criminal gangs have been playing hide and seek with the public authorities has truly became [sic] a National disgrace.”). Additionally, district attorneys were added to the list of county officials in a 1986 Amendment, which shows that the most recent trend in California is to confirm the district attorney’s place as a county officer. See Cal. Const. Art. XI, § 1(b), historical notes.
If the Attorney General believes a district attorney is not adequately prosecuting crime, the Attorney General is not given the power to force a district attorney to act or adopt a particular policy, but instead may step in and “prosecute' any violations of law” himself or herself. Cal. Const, art. V, § 13; see Cal. Gov.Code § 12550. The Attorney General may also, “with or without the concurrence of the district attorney, direct the grand jury to convene” and “may take full charge of the presentation of the matters to the grand jury....” CaLPenal Code '§ 923(a). The power to act in place of a district attorney is undoubtedly less than if the Attorney General could force a district attorney to use his or her own time and resources to act.
If the Attorney General does step in to conduct a prosecution, “in such cases the Attorney General shall have all the powers of a district attorney,” Cal. Const. art. V, § 13, which suggests that the Attorney General does not have those powers unless and until he or she steps in to-conduct a particular prosecution himself or herself. Finally, the Attorney General is given the power to “assist the district attorney in the discharge of the duties of that office,” Cal. Const. art. V, § 13, but this similarly does not suggest control over or the power to mandate that a district attorney adopt a particular policy.
Outside of conducting criminal prosecutions, the Attorney General’s power is even more attenuated: California authority indicates that district attorneys act on behalf of the county and are under the general control of the county board of supervisors. “The board of supervisors shall supervise the official conduct of all county officers,” including the district attorney, and the district attorney’s use of public funds. Cal. Gov.Code § 25303. As did the state in McMillian, the county board of supervisors “exercise[s] á general supervision over the” district attorney, and for most purposes, district attorneys are treated as “normal” county employees. See McMillian, 520 U.S. at 790, 117 S.Ct. 1734 (alterations in original).
The fact that the board of supervisors’, control “shall not be construed to effect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a-county,” Cal. .Gov. Code § 25303, does not change this conclusion. As we have previously explained when anályzing this provision as to the sheriff, this limitation seeks to insulate the sheriff and district attorney “from political pressure.” Brewster, 275 F.3d at 809. “The provision thus is akin to a separation of powers provision, and as such has no obvious bearing on whether [they] should be understood to act for the state or the county.... Merely because a county official exercises certain functions independently of other political entities within the county does not mean that he does not act for the county.” Id. at 810. Therefore, even though the board of supervisors does not exercise complete control over the-district attorney, that does not mean that the *758 district attorney was not acting on behalf of the county here.
Other provisions indicating that the district attorney here acts on behalf of the county include that the district attorney is paid “out of the county treasury,” Cal. Gov.Code § 28000, and the board of supervisors “shall prescribe the compensation” of the district attorney, Cal. Gov.Code § 25300; cf. McMillian, 520 U.S. at 791, 117 S.Ct. 1734 (“[T]he salaries of all sheriffs are set by the state legislature, not by the county commissions.”). Necessary expenses incurred “in the prosecution of criminal cases” are “county charges,”. Cal. Gov.Code § 29601, the district attorney must “account for all money received by him in his official capacity and pay it over to the treasurer” of the county board of supervisors. “The' district attorney shall render legal services to the county without fee,” Cal. Gov.Code § 26520; is the “legal adviser” for the county if there is no county counsel, Cal. Gov.Code § 26526; cannot “in any way advocate” against the county, Cal. Gov.Code § 26527; and may defend the county against the State of California in a state eminent domain proceeding, Cal. Gov.Code § 26541.
Finally, counties are required to defend and indemnify the district attorney in an action for damages. Cal. Gov.Code §§ 815.2, 825. The county’s obligation to defend and indemnify the district attorney in an action for damages is a “crucial factor [that] weighs heavily[.]” Streit v. Cnty. of Los Angeles, 236 F.3d 552, 562 (9th Cir.2001) (citation omitted). In McMillian, -the Court explained that the state’s responsibility for judgments against the sheriff was “critical” for the case and “strong evidence in favor of the ... conclusion that sheriffs act on behalf of the State.” McMillian, 520 U.S. at 789, 117 S.Ct. 1734.
C
In addition to constitutional and statutory provisions, the practical treatment of the policies Goldstein addresses supports the conclusion that this is a local, not statewide, determination. In 1988, a jailed informant demonstrated on 60 Minutes how easy it was to concoct a plausible “confession” to a crime by a prisoner he had never even met; in part because of this demonstration, a Los Angeles County Grand Jury convened to conduct “intensive investigation” and heard testimony from 120 witnesses about the use of jailhouse informants in Los Angeles County. Report of the 1989-90 Los Angeles County Grand Jury, Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County 1-2 (1990), available at http:// www.ccfaj.org/documents/reports/ jailhouse/expert/1989-1990% 20LA% 20County% 20Grand% 20Jury% 20Re-port.pdf.
The report it issued in 1990 recommended that the Los Angeles County “District Attorney’s Office should maintain a central file which contains all relevant information regarding the informant,” id. at 149, which that District Attorney’s Office has now done. .See Steve Cooley, Los Angeles County District Attorney’s Office, Legal Policies Manual 188 (April 2005), available at http://www.ccfaj.org/ documents/reports/jailhouse/expert/ LACountyDApolicies.pdf.
In 2004, a California State Senate Resolution created the California Commission on the Fair Administration of Justice, which was asked to “make any recommendations and proposals designed to further ensure that the application and administration of criminal justice in California is just, fair, and accurate[.]” California Commission on the Fair Administration of Justice, Final Report 186 (2008), available at *759 http://www.ccfaj.org/documents/ CCFAJFinalReport.pdf.
The Commission issued its final report in 2008 and made individualized recommendations about informant testimony" for the legislature, police agencies, prosecutors, judges, and defense lawyers. Id. at 13-14. The report specifically recommended that “California District Attorney Offices adopt a written internal policy, wherever feasible, to govern the use of in-custody informants. The policy should provide [for] the maintenance of a central file preserving all records relating to contacts with in-custody informants, whether they are used as witnesses or not.” Id. It is instructive that the Committee, with significant expertise with both district attorneys offices and state office,[5] specifically recommended that “California District Attorney Offices” should maintain the central file of informants, and did not include this among its separate recommendations for the legislature or suggest that the Attorney General promulgate a, rule. The Commission also conducted a survey of California county district attorneys, and of the nine responses the Commission received, only two offices had a “policy [that] requires the maintenance of a central file of all informant information.” Id. at 47. This similarly suggests that, at least up to this point, district attorney office policies related to informants have been addressed by the individual offices rather than by the state.[6]
D
Taking all of these provisions together, it is clear that the district attorney acts on behalf of the state when conducting prosecutions, but that the local administrative policies challenged by Goldstein are distinct from the prosecutorial act. Most significant is the contrast between the steps that were taken in Alabama to increase the state’s control over the sheriff in McMilli-an and the contrary California trend to categorize district attorneys as county officials; the fact that “[t]he board of supervisors shall supervise the official conduct of all county officers,” Cal. Gov.Code § 25303; and the fact that the county must defend and indemnify the district attorney in an action for damages, which the Supreme Court deemed “critical” in McMillian, 520 U.S. at 789, 117 S.Ct. 1734; see Cal. Gov.Code §§ 815.2, 825. Even taking into account the control and supervisory powers of the Attorney General, the Los Angeles County District Attorney represents the county when establishing admin *760 istrative policies and training related to the general operation of the district attorney’s office, including the establishment of an index containing information regarding the use of jailhouse informants.
Ill
The County raises additional arguments. However, on close examination, none is persuasive.
The County’s contention that the Supreme Court’s conclusion in Van de Kamp determines the outcome of this case is incorrect. Though the inquiries of pros-ecutorial immunity and state or local poli-cymaking may be related, they are separate. The prosecutorial immunity inquiry focuses on “policy considerations which compel civil immunity,” Imbler v. Pachtman, 424 U.S. 409, 429, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and is a federal question that will have a consistent answer nationwide. See Howlett v. Rose, 496 U.S. 356, 383, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). The state-local determination under Section 1983, although also a federal question ultimately, depends on a careful and thorough analysis of state constitutional and statutory provisions, and will vary “from region to region, and from State to State.” McMillian v. Monroe Cnty., 520 U.S. 781, 795, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). In Van de Kamp, the Supreme Court did not look to or examine California law, but focused on common-law traditions and policy implications in determining that the district attorney was entitled to absolute immunity.
The County similarly asserts, without citation, that California law conflates the two analyses: district attorneys act as State officials in the same instances that they are protected by absolute prosecutorial immunity. However, the California Supreme Court has explained that it is incorrect to “assume! ] that the functions for which a prosecutor may obtain absolute, as opposed to qualified, immunity parallel those for which a district attorney represents the state, as opposed to the county.” Pitts, 70 Cal.Rptr.2d 823, 949 P.2d at 935. “[T]hese are in fact separate inquiries.” Id.; see also Pembaur v. City of Cincinnati 475 U.S. 469, 474 n. 2, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (holding county liable for prosecutor’s actions after petitioner had conceded that prosecutor was absolutely immune).
■ Contrary to the County’s argument, our decision in Weiner has no bearing on this case. In Weiner, we held that a “district attorney act[s] on behalf of the state, not the county, in deciding to prosecute” a person for a crime, but acknowledged that “this is not to say that district attorneys in California are state officers for all purposes. To the contrary, California law suggests that a district attorney is a county officer for some purposes.” Weiner, 210 F.3d at 1026, 1031. Weiner challenged the prosecutor’s decision to retry him for murder after he was granted a new trial. Id. at 1027. In concluding that “a county district attorney acts as a state official when deciding whether to prosecute an individual,” we focused on the fact that, under California law, “[i]n the prosecution of criminal cases [the district attorney] acts by the authority and in the name of the people of the state.” Id. at 1030 (citations omitted); see also Cal. Gov.Code § 26500. Because we do not address the decision to prosecute an individual, the analysis in Weiner does not resolve the question before us today.
Similarly, the County is incorrect that we are bound by the California Supreme Court’s determination in Pitts that the district attorney acts on behalf of the state for some purposes. Though we must look at the relevant state law and state courts’ characterizations of that law, the final de *761 termination under 42 U.S.C. § 1983 is a federal law statutory interpretation question; no deference is due to the ultimate conclusion of the California court that the provisions, taken as a whole, indicate the district attorney was a state actor under Section 1983 for any particular function. See Weiner, 210 F.3d at 1025. “Although we must consider the state’s legal characterization of the government entities which are parties to these actions, federal law provides the rule of decision in section 1983 actions.” Streit v. Cnty. of Los Angeles, 236 F.3d 552, 560 (9th Cir.2001) (citations omitted). “State law does not control our interpretation of a federal statute.” Id.; see also Cortez v. Cnty. of Los Angeles, 294 F.3d 1186, 1191 (9th Cir.2002); Brewster, 275 F.3d at 811.
Nonetheless, we need not disrupt the California Supreme Court’s conclusion because Pitts addressed a district attorney function different than the one we confront today. In Pitts, the California Supreme Court concluded that “the district attorney represents the state, not the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas.” Pitts v. Cnty. of Kern, 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920, 923 (1998). Pitts alleged that the County and district attorney “established a pattern, custom, and practice of procuring false statements and testimony by threat, ... bribery, and coercion of witnesses” that “failed to provide adequate training, procedures, guidelines, rules, and regulations to prevent such conduct----” Id., 70 Cal.Rptr.2d 823, 949 P.2d at 927. The court noted that it was “not seeking to make a characterization of [California district attorneys] that will hold true for every type of official activity they engage in,” but instead focused on the district attorney’s function “when preparing to prosecute and when prosecuting criminal violations of state law, and when training and developing policies for employees engaged in these activities.” Id., 70 Cal.Rptr.2d 823, 949 P.2d at 928.
The California Supreme Court analyzed the provisions of the California Constitution and the statutes discussed above, and based on these considerations, it concluded that “when preparing to prosecute and when prosecuting criminal violations of state law, a district attorney represents the state and is not a policymaker for the county.” Id., 70 Cal.Rptr.2d 823, 949 P.2d at 934. That determination is not implicated by Goldstein’s claims.
As to training and supervising staff, the California Supreme Court said that based on its conclusion that the district attorney represents the state “when preparing to prosecute and when prosecuting criminal violations of state law,” it “further concludes it logically follows that he or she also represents the state, and not the county, when training and developing policy in these areas. No meaningful analytical distinction can be made between these two functions.” Id., 70 Cal.Rptr.2d 823, 949 P.2d at 935. Separating these two functions would “require impossibly precise distinctions” and would lead to “nonsensical,” “arbitrary” results. Id.
The Pitts Court examined the training and policies that “failed to ... prevent” the use of “threat, ... bribery, and coercion of witnesses,” id., 70 Cal.Rptr.2d 823, 949 P.2d at 927, and the challenged policies were part of the training for district attorneys’ preparation of individual witness for particular trials. In Pitts, child witnesses were coerced into testifying falsely that the defendants, their acquaintances or relatives, had sexually abused them. Id., 70 Cal.Rptr.2d 823, 949 P.2d at 923. Coerced testimony from the alleged victim of a crime is inextricably linked to the prosecution of that crime.
*762 The function at issue here, on the other hand, is distinguishable from the question confronted by the California Supreme Court because Goldstein challenges administrative policy and accompanying training, rather than prosecutorial training and policy. Goldstein’s challenge focuses on the failure to create an index that includes information about benefits provided to jailhouse informants and other previous knowledge about the informants’ reliability, and the failure to train prosecutors to use that index. Goldstein alleges that it was the lack of an index that allowed Fink to lie about the benefits he réceived for testifying against Goldstein, . prevented prosecutors in Goldstein’s case from knowing Fink’s history, and prevented Gold-stein’s counsel from impeaching Fink.
The conduct at issue here does not involve prosecutorial strategy, but rather administrative oversight of systems used to help prosecutors comply with their constitutional duties. See Van de Kamp, 555 U.S. at 344, 129 S.Ct. 855 (“We agree with Goldstein that, in making these claims, he attacks the office’s administrative procé-dures.”); Pitts, 70 Cal.Rptr.2d 823, 949 P.2d at 935 (“Our conclusion as to which entity the district attorney represents might differ were plaintiffs challenging ... some other administrative function....”). In Pitts, there was no administrative function involved. There can be a “meaningful analytical distinction” between policies and training relating to prosecutorial functions and an index made and maintained as an administrative matter.

IV

In sum, we conclude that the policies challenged by Goldstein are distinct from the acts the district attorney undertakes on behalf of the state. Even taking into account the control and supervisory powers of the Attorney General, the Los Ange-les County District Attorney represents the county when establishing policy and training related to the use of jailhouse informants. Therefore, a cause of action may lie against the County under 42 U.S.C. § 1983. We reverse the judgment of the district court.
REVERSED AND REMANDED.

. Appellant's motion for judicial notice is GRANTED.

. The district court had also dismissed with prejudice claims against Long Beach, California defendants the City of Long Beach, John Henry Miller, William Collette, and William MacLyman based on a settlement between those parties and Goldstein.

. The county was not able to change the sheriff's salary or refuse to pay him, though it could "deny funds ... beyond what is reasonably necessary.” McMillian, 520 U.S. at 791, 117 S.Ct. 1734 (internal quotation marks and citation omitted).

. A contrary conclusion here that the district attorney here acts on behalf of the state would be in tension with Brewster, given our conclusion there that the sheriff acts on behalf of the county when conducting investigations even though the Attorney General has much greater supervisory power over sheriffs than district attorneys. Compare Cal. Gov.Code § 12560 ("Whenever [the Attorney General] deems it necessary in the public interest he shall direct the activities of any sheriff relative to the investigation or detection of crime within the jurisdiction of the sheriff....” (emphasis added)) with Cal. Gov.Code § 12550 (“When [the Attorney General] deems it advisable or necessary in the public interest, or when directed to do so by the Governor, he shall assist any district attorney in the discharge of his duties....” (emphasis added)). This is in contrast to the many provisions of the California Code that treat sheriffs and district attorneys identically. See, e.g., Cal. Gov.Code §§ 12524, 24000, 24001, 25300, 25303, 29601.

. For example, the Chair of the Commission was John K. Van de Kamp, the Los Angeles County District Attorney at the time Goldstein was tried and later a two-term Attorney General for the State of California. See California Commission on the Fair Administration of Justice, Final Report 1 (2008), available at ‘http://www.ccfaj.org/documents/CCFAJFinal Report.pdf.

. We do recognize that the fact that the Attorney General has not required all district attorney offices to adopt a policy creating a central file for informants does not mean that she lacks the power to do so, but we do note that Los Angeles County contends that the Attorney General has much greater power than has ever been exercised. At oral argument, for example, the County explained that the Attorney General has the power to make the decision that no death penalty cases will be prosecuted in the state of California, to require district attorneys offices statewide to maintain an "open-file" policy, or to require that a centralized database for jailhouse informants be adopted. The County offered neither authority for nor examples of an Attorney General establishing policy in this way. The County was also unable to offer and we have been unable to find any example of the Attorney General stepping in to take over a prosecution or dictating any sort of policy to a district attorney's office without a request from the district attorney's office that he or she do so.